(No. 92777.—

*In re* MARY ANN P. (The People of the State of Illinois, Appellant, v. Mary Ann P., Appellee).

*Opinion filed November 21, 2002.*

James E. Ryan, Attorney General, of Springfield, and
Meg Gorecki, State's Attorney, of St. Charles (Joel D.

Bertocchi, Solicitor General, of Chicago, and Norbert J. Goetten, Martin P. Moltz and Diane L. Campbell, of the Office of the State's Attorneys Appellate Prosecutor, of Elgin, of counsel), for the People.

Jeff M. Plesko and William E. Coffin, of the Illinois Guardianship & Advocacy Commission, of Chicago, for appellee.

Saul J. Morse and Robert John Kane, of Springfield, for *amici curiae* Illinois State Medical Society & Illinois Psychiatric Society.

JUSTICE FITZGERALD delivered the opinion of the court:

This appeal concerns the operation of section 2—107.1 of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/1—100 *et seq.* (West 2000)). Section 2—107.1 permits the circuit court, upon the filing of a petition and following an evidentiary hearing, to enter an order authorizing the administration of involuntary treatment to a recipient of mental health services. The involuntary treatment involved in this case is the administration of psychotropic medication. The issue we consider is whether section 2—107.1 requires the use of a special verdict form, so that the jury may "selectively authorize" the involuntary administration of only those medications it deems appropriate. For the reasons discussed below, we conclude that section 2—107.1 does not permit selective authorization of psychotropic medication. Accordingly, we reverse the judgment of the appellate court and affirm the judgment of the trial court.

BACKGROUND

On March 13, 2000, the State filed a petition in the circuit court of Kane County, pursuant to section

2—107.1 of the Code, seeking an order authorizing the involuntary administration of psychotropic medication to respondent, Mary Ann P., for a period of 90 days. The petition was signed by Dr. Donna Luchetta, respondent's treating psychiatrist at the Elgin Mental Health Center (EMHC) from December 1998 to June 2000. The petition listed six medications: Zeprexa, Orap, Haldol, Haldol decanoate, Cogentin, and Ativan. On the preprinted petition form, Zeprexa was listed as the "1st choice," and the other five medications were listed as "Alternatives." The petition also identified a dosage range for each drug and the tests and procedures necessary for administration of the drugs.

At the hearing on the State's petition, Dr. Luchetta testified that respondent had been transferred from Northwest Community Hospital to the EMHC on December 28, 1998, and involuntarily admitted on the petition of her mother. This was not the first time respondent had been admitted to the EMHC. According to Dr. Luchetta, respondent suffers from paranoid schizophrenia, a psychotic disorder marked by paranoid and somatic delusions, disorganized thought processes, and impaired social and occupational functioning. Dr. Luchetta described respondent's delusions and the ways in which her ability to function had deteriorated.

Dr. Luchetta further testified that, beginning in July or August 1999, as the result of a prior court proceeding, respondent was involuntarily administered psychotropic medication. Prolixin was initially administered but was discontinued after it caused parkinsonism, a temporary syndrome characterized by symptoms similar to those associated with Parkinson's disease. In late August 1999, Zeprexa was administered, which lessened respondent's delusions. In September 1999, Orap was also administered, which significantly diminished respondent's delusions. While medicated, and for a short time afterwards,

respondent was pleasant, appropriate, and well-engaged. Respondent was able to participate successfully in EMHC workshops. She was no longer agitated, hostile, intrusive, or argumentative. Respondent told Dr. Luchetta that she felt better. Toward the end of the involuntary medication period in October 1999, respondent told Dr. Luchetta that she would like a trial period without medication. Subsequently, in November 1999, her medications were tapered off. On several occasions thereafter, Dr. Luchetta recommended that respondent resume medication. Respondent refused every treatment recommendation, and by March 2000 she was again psychotic and delusional. At the time of the hearing, respondent was unable to work and provide for her own basic needs.

Dr. Luchetta testified at length about the benefits and potential side effects of each medication listed in the petition. Dr. Luchetta stated that Zeprexa was her "first choice" in medication. She explained that Zeprexa is a relatively new atypical antipsychotic drug that resolves psychosis by changing the balance of natural substances in the nervous system, particularly dopamine. Possible side effects include weight gain, constipation, dry mouth, hypotension, and a movement disorder known as tardive dyskinesia. Dr. Luchetta's second medication choice was Orap. Although Orap is prescribed primarily for the treatment of Tourette's Syndrome or tic disorders, it also resolves psychosis by decreasing the amount of dopamine in the system. Orap can also induce tardive dyskinesia. Dr. Luchetta testified that, during the period in 1999 when respondent was being treated with Zeprexa and Orap, she experienced minimal side effects and did not exhibit any signs of tardive dyskinesia.

The next two medications listed in the petition were Haldol, a typical antipsychotic medication, and Haldol decanoate, the injectable form of Haldol. Dr. Luchetta testified that Haldol decanoate can last up to four weeks

in the patient's system and is beneficial in cases where the patient is unwilling to take medication on a daily basis. Haldol can produce significant side effects, including tardive dyskinesia, which occurs in approximately one of 100 patients, and neuroleptic malignant syndrome, a condition that adversely affects regulation of a person's body temperature and occurs in approximately one of 1,000 patients. Haldol can also produce parkinsonism and extrapyramidal side affects, *i.e.*, acute muscle contracture. Dr. Luchetta stated that the drug Cogentin, also listed in the petition, blocks some of these extrapyramidal side effects. The most common side effect of Cogentin is blurred vision, a condition that can be monitored.

The final medication listed in the petition was Ativan, a mild tranquilizer. Dr. Luchetta testified that administration of a small amount of Ativan can greatly reduce the dosages of antipsychotic medications administered and, in turn, prevent many of the side effects. The antianxiety effects of Ativan, which is available in injectable form, also help persuade an otherwise unwilling patient to take medications, such as Zeprexa and Orap, which are in tablet or liquid form.

In addition, Dr. Luchetta testified that the side effects of any medication can be monitored through observation and testing, including a complete blood count, a thyroid function test, urinalysis, a comprehensive metabolic profile, and an electrocardiogram. The medications would be administered in the lowest effective dose. It was Dr. Luchetta's opinion that the benefits of the medications outweigh the harmful side effects and that respondent lacks the capacity to make a reasoned or informed decision about such treatment. On several occasions Dr. Luchetta attempted to discuss with respondent the advantages and disadvantages of the medications listed in the petition, but respondent refused to

discuss treatment, or responded by swearing, walking away, or talking about an unrelated matter. Finally, Dr. Luchetta testified that less restrictive services, such as an outpatient program or counseling, are not viable options.

Dr. Nageswara Rao Nagarakanti, respondent's treating psychiatrist at the time of the hearing, also testified. He agreed with the medication recommendations set forth in the petition and had attempted, on three or four occasions, to discuss these medications with respondent. She denied having a mental illness and told Dr. Nagarakanti that she did not need any medication. In light of her psychosis, Dr. Nagarakanti did not believe that respondent had the ability to understand the advantages and disadvantages of the medications.

The State called respondent as its final witness. She testified that she had been "abducted, drugged and detained" at the EMHC by a man she had never met. Upon questioning by the State, respondent recounted her cancer-related surgery and stated that she had seen no proof that the cancer had not recurred. Dr. Luchetta had earlier testified that respondent had cervical cancer in 1982, but that a test performed in September 1999 showed normal results. When asked about other physical ailments, respondent testified that the EMHC had sent her to a dentist, she had teeth removed, and she was given an overdose of penicillin or some other medication. Respondent stated that, rather than being treated at the EMHC, she should have been taken to an oncologist for an examination of the lump in her throat.

Respondent further testified that Dr. Nagarakanti only wants to sell her drugs and that "[w]hen something does not agree with what [Dr. Luchetta's] diagnosis is, it disappears." Respondent stated that she observed her caseworker and other people going through her medical records and "things being discarded into the garbage."

Respondent also made reference to being restrained at the EMHC and described various incidents in which she had been injured by other patients. She indicated that the EMHC staff is not responsive when such incidents occur.

Finally, respondent testified that she did not want to be medicated because it caused her pain, although she also stated that the pain occurs both on and off the medication. She also indicated that the medication made her dry and constipated, caused her nose to bleed, blurred her vision, and impaired her concentration.

Respondent called no witnesses and the trial court denied her motion for a directed verdict. Following deliberations, the jury returned a verdict in favor of the State and against respondent, finding her to be "someone who qualifies for the involuntary administration of psychotropic medication." The trial court entered an order authorizing the administration of psychotropic medication for a period not to exceed 90 days. The order listed the six medications and dosage ranges. Respondent appealed, arguing that she was denied her right to due process when the trial court improperly instructed the jury under the 1998 version of section 2—107.1, and when the trial court gave the jury a general verdict form that did not permit it to specify which medications were appropriate.

With one justice dissenting, the appellate court reversed. No. 2—00—1130 (unpublished order under Supreme court Rule 23). Citing *In re Nancy M.*, 317 Ill. App. 3d 167 (2000), the appellate court held that the jury was required to specify in its verdict which medications were appropriate, and that the general verdict form "failed to show that the jury clearly intended to authorize the administration of all six medications listed in the trial court's subsequent written order." The dissenting justice disagreed, citing the reasons set forth in his dis-

sent in *In re Frances K.*, 322 Ill. App. 3d 203, 211-13 (2001) (Grometer, J., dissenting). In that case, the dissenting justice criticized *Nancy M.*, stating that, "under the holding of *Nancy M.*, the jury is, in effect, being asked to prescribe the medication and treatment" and that "[s]uch a requirement *** goes far beyond the clear legislative scheme." *Frances K.*, 322 Ill. App. 3d at 213. The appellate court found it unnecessary to consider respondent's argument that the jury was instructed under the wrong version of section 2—107.1.

We allowed the State's petition for leave to appeal (see 177 Ill. 2d R. 315(a)), and allowed the Illinois State Medical Society and the Illinois Psychiatric Society to file an *amicus curiae* brief in support of the State (see 155 Ill. 2d R. 345).

## ANALYSIS

### I

At the outset, we observe that this case is moot. Section 2—107.1 provides that an order authorizing the administration of involuntary treatment shall, in no event, be effective for more than 90 days. 405 ILCS 5/2—107.1(a—5)(5) (West 2000).[1] The trial court's order granting the petition for involuntary administration of psychotropic medication was entered on September 18, 2000. The 90 days have long since passed and the trial court's order—valid or invalid—no longer has any force or effect. Thus, it is impossible for this court to grant effectual relief to either party, and any decision we render is essentially an advisory one. See *In re Barbara H.*, 183 Ill. 2d 482, 490 (1998); *In re A Minor*, 127 Ill. 2d 247, 255 (1989). Generally, a reviewing court will not consider moot or abstract questions or render advisory decisions. *Steinbrecher v. Steinbrecher*, 197 Ill. 2d 514, 523 (2001);

---

[1]All citations to the Code are to that version in effect at the time of the section 2—107.1 hearing in this case.

*Barbara H.*, 183 Ill. 2d at 491. We find, however, that this case qualifies for review under the "public interest exception" to the mootness doctrine. The criteria for application of this exception are: (1) the public nature of the question; (2) the desirability of an authoritative determination for the purpose of guiding public officers; and (3) the likelihood that the question will recur. *In re Adoption of Walgreen*, 186 Ill. 2d 362, 365 (1999); *Radazewski v. Cawley*, 159 Ill. 2d 372, 376 (1994). This case satisfies all three criteria.

First, the procedures which must be followed and the proofs that must be made before a court may authorize involuntary treatment to recipients of mental health services are matters of a public nature and of substantial public concern. See generally *In re C.E.*, 161 Ill. 2d 200, 213-19 (1994) (discussing the state's *parens patriae* interest in furthering the treatment of mentally ill persons and the liberty interests implicated where treatment is involuntarily administered). The question we consider here—whether the Code permits selective authorization of psychotropic medication—is likewise a matter of substantial public concern. Second, an authoritative determination is desirable in light of the conflict in the case law on this issue. Compare *Nancy M.*, 317 Ill. App. 3d at 178-79 (holding that the jury was required to make findings, either in special interrogatories or in its verdict, as to whether the benefits of a particular medication outweighed the harm), and *Frances K.*, 322 Ill. App. 3d at 209-10 (following *Nancy M.* and holding that the verdict form, which did not include any space for the jury to determine the medications or doses to be administered, required reversal), with *In re R.W.*, 332 Ill. App. 3d 901, 911 (2002) (holding that section 2—107.1 does not require a specialized verdict addressing each particular medication), *pet. for leave to appeal pending* No. 94556. Finally, because of the relatively short duration of

involuntary treatment orders, the circumstances present in this case will recur. Review is, therefore, appropriate.

II

Section 2—107.1 of the Code sets forth the standards and procedures that must be satisfied for the administration of "[a]uthorized involuntary treatment" to adult recipients of mental health services. "Authorized involuntary treatment" is defined as "psychotropic medication or electro-convulsive therapy [ECT], including those tests and related procedures that are essential for the safe and effective administration of the treatment." 405 ILCS 5/1—121.5 (West 2000). Section 2—107.1 applies where a person who is receiving mental health services is unable to make a decision in his or her own behalf regarding the administration of psychotropic medication or ECT. See *C.E.*, 161 Ill. 2d at 228. The procedures set forth in this section of the Code ensure that involuntary treatment will be used for therapeutic purposes only and not simply as a means to manage or discipline recipients of mental health services. See *C.E.*, 161 Ill. 2d at 218-19.

Proceedings under section 2—107.1 are initiated by the filing of a petition in the circuit court. The court is required to hold an evidentiary hearing on the petition within the prescribed period. See 405 ILCS 5/2—107.1(a—5)(2) (West 2000) (setting forth the initial time frame and allowable continuances). Significantly, section 2—107.1 provides that authorized involuntary treatment shall not be administered unless it is determined, by clear and convincing evidence, that the following seven factors are present:

"(A) That the recipient has a serious mental illness or developmental disability.

(B) That because of said mental illness or developmental disability, the recipient exhibits any one of the following: (i) deterioration of his or her ability to function, (ii) suffering, or (iii) threatening behavior.

(C) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in item (B) of this subdivision (4) or the repeated episodic occurrence of these symptoms.

(D) That the benefits of the treatment outweigh the harm.

(E) That the recipient lacks the capacity to make a reasoned decision about the treatment.

(F) That other less restrictive services have been explored and found inappropriate.

(G) If the petition seeks authorization for testing and other procedures, that such testing and procedures are essential for the safe and effective administration of the treatment." 405 ILCS 5/2—107.1(a—5)(4) (West 2000).

The focus of this appeal is factor (D): "That the benefits of the treatment outweigh the harm."

Consistently with the appellate court's decision, respondent maintains that a special verdict form is required in a section 2—107.1 hearing so that the jury may selectively authorize the involuntary administration of only those medications it has determined are more beneficial than harmful. See *Nancy M.*, 317 Ill. App. 3d at 178-79; *Frances K.*, 322 Ill. App. 3d at 209-10. The State argues that section 2—107.1 only requires the jury to pass on the propriety of the treatment as a whole and that the legislature did not intend for jurors to "pick and choose" among the medicinal components of the treatment. According to the State, the use of a special verdict form, listing specific medications and dosages, would allow the jury to invade the province of qualified and knowledgeable physicians. See *Frances K.*, 322 Ill. App. 3d at 213 (Grometer, J., dissenting); *R.W.*, 332 Ill. App. 3d at 911 (finding the dissent in *Francis K.* persuasive). Whether section 2—107.1 permits selective authorization of psychotropic medication, and thus requires the use of a special verdict form, is a matter of statutory construction. Our review, therefore, proceeds *de novo. People ex rel. Devine v. $30,700 United States Currency*, 199 Ill. 2d 142, 148-49 (2002).

The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature. *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 342 (2002); *Lulay v. Lulay*, 193 Ill. 2d 455, 466 (2000). The most reliable indicator of the legislature's intent is the language used in the statute, which must be given its plain and ordinary meaning. Where the statutory language is clear and unambiguous, it will be given effect without resort to other aids of construction. *Lulay*, 193 Ill. 2d at 466. Based on the plain language of section 2—107.1, we hold that the statute does not permit selective authorization of psychotropic medication.

Section 2—107.1(a—5)(4)(D) requires the fact finder to consider, *inter alia*, whether the benefits of the recommended "treatment" outweigh the harm. 405 ILCS 5/2—107.1(a—5)(4)(D) (West 2000). Although treatment with psychotropic medication may involve the administration of a single drug (see, *e.g.*, *In re Miller*, 301 Ill. App. 3d 1060, 1065-66 (1998)), treatment frequently involves the administration of several medications (see, *e.g.*, *R.W.*, 332 Ill. App. 3d at 903-04; *In re Williams*, 305 Ill. App. 3d 506, 507-08 (1999); *In re Barry B.*, 295 Ill. App. 3d 1080, 1083 (1998); *In re Perona*, 294 Ill. App. 3d 755, 767 (1998)). Nothing in the language of section 2—107.1 indicates that where the treatment involves more than one medication, the legislature intended the jury to parse the treatment and choose among the various medications. Similarly, nothing in the language of section 2—107.1 indicates that the legislature intended treatment orders to authorize something less than what the treating physician has prescribed. Accordingly, where, as here, the recommended treatment consists of multiple medications—some to be administered alternatively, some to be administered in combination, and some to be administered only as needed to counter side effects—it is

only this treatment, in its entirety, that may be authorized.

Respondent contends that because the statute does not expressly prohibit selective authorization, it is impliedly allowed. We disagree. Statutes should be construed in a manner that avoids absurd, unreasonable, unjust or inconvenient results. *In re B.C.*, 176 Ill. 2d 536, 543 (1997); *Collins v. Board of Trustees of the Firemen's Annuity & Benefit Fund*, 155 Ill. 2d 103, 110 (1993). Construing the statute to permit selective authorization of only certain medications would permit the jury to substitute a treatment different from the one recommended by the testifying physician and set forth in the petition. As this court has recognized, however, the diagnosis and treatment of mental health disorders is a " 'highly specialized area of medicine which is better left to the experts.' " *C.E.*, 161 Ill. 2d at 229, quoting *In re Ingersoll*, 188 Ill. App. 3d 364, 368 (1989). Indeed, section 2—107.1 vests the physician authorized to administer the involuntary treatment "complete discretion" *not* to administer the treatment. 405 ILCS 5/2—107.1(a—5)(6) (West 2000). It is thus not for the trial court or the jury to "develop a course of treatment and then dictate that course to the treating physician. That would constitute role reversal." *In re Gwendolyn N.*, 326 Ill. App. 3d 427, 431 (2001). In the words of *amici curiae*, allowing the layperson jury to determine which of the various medications should be involuntarily administered "dangerously approaches the practice of medicine." Certainly the legislature could not have intended such an unreasonable result.

The appellate court's decision in *Nancy M.*, cited by respondent as well as the appellate court below, does not persuade us that selective authorization is permitted under the statute. In *Nancy M.*, the circuit court, following a jury trial, entered an order authorizing the

involuntary administration of three psychotropic medications. The appellate court reversed, agreeing with the respondent that the verdict form should have listed each requested medication and that the general verdict form failed to afford the jurors an opportunity to determine which medication the respondent should have been involuntarily administered. *Nancy M.*, 317 Ill. App. 3d at 176-79. The *Nancy M.* decision, in turn, was based on the reasoning and analysis in *In re Len P.*, 302 Ill. App. 3d 281 (1999). In *Len P.*, the respondent challenged the trial court's involuntary treatment order because it failed to specify the drugs to be administered and the dosages, contrary to the express requirements of the Code. See 405 ILCS 5/2—107.1(a—5)(6) (West 2000). The appellate court reversed. The appellate court noted that the type of medication to be used is a necessary component of the State's burden to prove that the benefits of the medication outweigh the harm. The physician's testimony on this subject, however, was vague. Because the trial transcript could not provide the essential information missing from the trial court's order, the error was more substantive than procedural, and reversal was required. *Len P.*, 302 Ill. App. 3d at 285-86.

Plainly, the issue addressed in *Len P.* is not the same issue we address in the instant case. *Len P.* considered only whether the circuit court's treatment order must be reversed where neither the order, nor the trial transcript, provided the required specificity as to the medications and dosages. Here, we consider whether the statute permits the fact finder in a section 2—107.1 proceeding to parse the recommended treatment and selectively authorize only certain requested medications. Because *Nancy M.* relied on *Len P.*, and *Len P.* considered a different issue than the one raised in this case, *Nancy M.* does not provide a sound basis for construing section 2—107.1 in the manner advanced by respondent and set forth in

the appellate court's order. Further, to the extent *Nancy M.* and subsequent cases conflict with our holding today, they are overruled.

Respondent also argues that the statute's requirement that treatment orders specify the medications and dosages authorized is evidence that the legislature intended selective authorization of medication. We disagree. In light of the substantially invasive nature of involuntary treatment, the liberty interests implicated when a person is medicated against his or her will, and the potential for misuse of psychotropic medication (see *C.E.*, 161 Ill. 2d at 213-15), we believe that the specificity requirement for involuntary treatment orders reflects the legislature's legitimate concern that only qualified health care professionals, familiar with the respondent's mental and physical status, be permitted to administer the treatment and that the respondent, as well as the treaters, be notified of the exact nature of the treatment authorized. See *Williams*, 305 Ill. App. 3d at 510-11; *Miller*, 301 Ill. App. 3d at 1072; accord *In re Cynthia S.*, 326 Ill. App. 3d 65, 68-69 (2001). That the legislature has prudently provided for specificity in treatment orders entered by the trial court does not lead to the conclusion, however, that the legislature intended a similar requirement in the verdict form so that the jury may decide which of the medicinal components of the proposed treatment should be administered.

We note first that the legislature has employed different language in the subsection requiring specificity in treatment orders and the subsection addressing the findings necessary before involuntary treatment may be authorized. The subsection setting forth the requirements for treatment orders states:

"An order issued under this subsection *** shall designate the persons authorized to administer the authorized involuntary treatment under the standards and procedures of this subsection ***. Those persons shall have

complete discretion not to administer any treatment authorized under this Section. The order shall also specify the medications and the anticipated range of dosages that have been authorized." 405 ILCS 5/2—107.1(a—5)(6) (West 2000).

In contrast, the subsection addressing the findings required before involuntary treatment may be authorized states that "involuntary treatment shall not be administered to the recipient unless it has been determined by clear and convincing evidence that *** the benefits of the treatment outweigh the harm." 405 ILCS 5/2—107.1(a—5)(4)(D) (West 2000). It is a basic rule of statutory construction that, "by employing certain language in one instance and wholly different language in another, the legislature indicates that different results were intended." *In re K.C.*, 186 Ill. 2d 542, 549-50 (1999). Accordingly, we will not assign the same meaning to these two subsections or engraft the specificity requirement from one subsection onto the other subsection.

In addition, we note that the legislature has seen fit to amend the Code numerous times, and that the legislature amended section 2—107.1 in 1997, adding the express requirement that treatment orders specify the medications and dosages. See Pub. Act 90—538, eff. December 1, 1997. Had the legislature also intended to permit selective authorization of medication, it could have done so. The legislature has not seen fit to amend the statute in this fashion, and we will not, under the guise of statutory construction, inject this provision into the statute. See *People ex rel. Devine*, 199 Ill. 2d at 150-51 (court will not depart from plain language of statute by reading into it exceptions, limitations or conditions not expressed by the legislature); *People v. Tucker*, 167 Ill. 2d 431, 437 (1995) (court would not rewrite statute under guise of statutory construction).

Respondent argues in the alternative that section 2—107.1 of the Code must be construed in harmony with

other statutes relating to the same subject matter. See *People v. Maya*, 105 Ill. 2d 281, 286-87 (1985). Respondent directs our attention to the Powers of Attorney for Health Care Law (755 ILCS 45/4—1 *et seq.* (West 2000)) and the Mental Health Treatment Preference Declaration Act (755 ILCS 43/1 *et seq.* (West 2000)).

The Powers of Attorney for Health Care Law allows an individual, the "principal," to designate a "trusted agent *** to make personal and health care decisions" in the event the principal becomes disabled. 755 ILCS 45/4—1 (West 2000). Health care powers that the individual may delegate to his or her agent "include, without limitation, all powers an individual may have to be informed about and to consent to or refuse or withdraw any type of health care for the individual." 755 ILCS 45/4—3 (West 2000). The agent's authority "may extend beyond the principal's death if necessary to permit anatomical gift, autopsy or disposition of remains." 755 ILCS 45/4—3 (West 2000). The agent has the same access to the principal's medical and mental health records as the principal would have. 755 ILCS 45/4—7(c) (West 2000).

The Mental Health Treatment Preference Declaration Act allows an "adult of sound mind" to make an advance "declaration of preferences or instructions regarding mental health treatment." 755 ILCS 43/10(1) (West 2000). The declaration may include "consent to or refusal of mental health treatment." 755 ILCS 43/10(1) (West 2000). "Mental health treatment" includes, among other things, treatment with psychotropic medication. 755 ILCS 43/5(7) (West 2000). The declaration may designate an adult to act as "attorney-in-fact" to make decisions about treatment when the declarant is incapable. 755 ILCS 43/15, 43/30 (West 2000). The form of declaration set forth in the statute provides that the declarant may indicate that he or she consents to, or does not consent to, the administration of particular psy-

chotropic medications. 755 ILCS 43/75 (West 2000). A declaration designating an attorney-in-fact remains in effect until it is revoked or the attorney withdraws. 755 ILCS 43/10(2), 50, 70 (West 2000).

Respondent contends that the foregoing statutes, and section 2—107.1, all relate to the provision of health care treatment and should be construed in a single fashion. Specifically, respondent contends that the fact finders in a section 2—107.1 proceeding, like the "surrogate decision makers" in the foregoing statutes, must be allowed to selectively authorize only some of the medications comprising the prescribed treatment plan.

Although the Powers of Attorney for Health Care Law, the Mental Health Treatment Preference Declaration Act, and the Code each provide a mechanism for making treatment decisions where an individual is deemed incapable of doing so, the jury in a section 2—107.1 proceeding functions differently than an individual's "trusted agent" (755 ILCS 45/4—1 (West 2000)) or "attorney-in-fact" (755 ILCS 43/15 (West 2000)). The jury in a section 2—107.1 proceeding has no prior relationship with the respondent, no prior knowledge of the respondent's preferences regarding mental health treatment, and no ongoing relationship with the respondent or the respondent's treating physicians. Rather, the jury functions within the framework of an adversarial proceeding and is called upon, as an impartial fact finder, to make a single decision regarding the respondent's mental health treatment based solely on the evidence and argument presented at the hearing. Once the jury renders its verdict, the jury is discharged and its limited involvement with the respondent's health care ceases. These significant differences persuade us that section 2—107.1 should not be construed to provide the jury the same powers expressly accorded to an individual's "trusted agent" or "attorney-in-fact."

Consequently, we will not read section 2—107.1 to permit selective authorization of medication.

Respondent additionally argues that prohibiting selective authorization of medication could result in a petitioner requesting authority to administer an "unlimited" number of medications, thus "forcing" fact finders to condone a physician's "mere experimentation." Although we are aware of the potential for misuse of psychotropic medication (see *C.E.*, 161 Ill. 2d at 215), we do not share respondent's fear that mental health patients will be subjected to "mere experimentation" if trial judges and juries are not allowed to selectively choose which medications should be administered. The specificity requirement for involuntary treatment orders (405 ILCS 5/2—107.1(a—5)(6) (West 2000)) precludes a court from entering an order permitting an "unlimited" number of medications to be administered to the respondent. Further, the statute's requirement that the petitioner demonstrate, by clear and convincing evidence, "[t]hat the benefits of the treatment outweigh the harm" (405 ILCS 5/2—107.1(a—5)(4)(D) (West 2000)) militates against the petitioner presenting a treatment plan that is so ill-defined as to constitute mere experimentation. Finally, respondent's concern that, in the absence of selective authorization, physicians will be permitted to experiment on their mental health patients is contrary to respondent's position that the "complete discretion" physicians enjoy under the Code (405 ILCS 5/2—107.1(a—5)(6) (West 2000)) actually ensures that improvidently entered treatment orders pose no risk to the patient. Accordingly, we reject respondent's "mere experimentation" argument.

Because we hold that section 2—107.1 of the Code does not permit selective authorization of psychotropic medication, we also hold that a special verdict form, listing each individual medication and accompanying dosage

range, is not required in a section 2—107.1 proceeding. Thus, a general verdict form, like the one used in this case, comports with the statute. By signing the general verdict form, the jury necessarily found that the State had proved each of the factors set forth in section 2—107.1, including that "the benefits of the treatment outweigh the harm." 405 ILCS 5/2—107.1(a—5)(4)(D) (West 2000).

### III

As a final matter, we consider whether remand to the appellate court is appropriate. As indicated earlier, respondent raised two issues in the appellate court. Based on the appellate court's ruling on the selective-authorization issue, the court found it unnecessary to consider respondent's argument that she was denied due process when the trial court instructed the jury pursuant to the 1998 version of section 2—107.1, rather than, presumably, the version in effect at the time of the proceeding in 2000. Respondent has not pressed this argument before this court and we find it unnecessary to remand this matter to the appellate court for consideration of this issue.

A reviewing court's determination of whether the jury was properly instructed can have no effect on the outcome of the case in light of the significant time that has passed since the 90-day treatment order was entered. Thus, the issue is moot. See *Barbara H.*, 183 Ill. 2d at 490-91. Further, it is highly unlikely that the claimed error would recur. Thus, it does not qualify for review under the recognized exceptions to the mootness doctrine. See *In re A Minor*, 127 Ill. 2d at 257-58. Assuming *arguendo* that this issue was appropriate for review, based on our examination of the record, the claimed error in the jury instructions would not have affected the outcome of the proceeding.

CONCLUSION

As discussed above, we conclude that (i) the issue of selective authorization of psychotropic medication under section 2—107.1 of the Code qualifies for review under the public interest exception to the mootness doctrine; (ii) the Code cannot reasonably be construed to permit selective authorization of psychotropic medication and, thus, a special verdict form is not required in a section 2—107.1 proceeding; and (iii) remand to the appellate court is unnecessary. Consequently, we reverse the judgment of the appellate court and affirm the judgment of the circuit court.

*Appellate court judgment reversed;*
*circuit court judgment affirmed.*