NOTICE

Decision filed 07/01/19. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2019 IL App (5th) 150302

NO. 5-15-0302

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* H.P. | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Randolph County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 15-MH-75 |
| v. | ) | |
| | ) | |
| H.P., | ) | Honorable |
| | ) | Richard A. Brown, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE CHAPMAN delivered the judgment of the court, with opinion.
Presiding Justice Overstreet and Justice Cates concurred in the judgment and opinion.

**OPINION**

¶ 1    The respondent, H.P., appeals an order authorizing involuntary administration of psychotropic medication. At issue is whether the State must present evidence of known interactions between multiple medications in order to satisfy its statutory burden of demonstrating that the benefits of the proposed treatment outweigh the harm. See 405 ILCS 5/2-107.1(a-5)(4)(D) (West 2014). We hold that it must.

¶ 2    H.P. argues that (1) the State did not prove by clear and convincing evidence that the benefits of the proposed treatment outweighed the risk of harm because its expert witness did not specifically testify to the benefits of using more than one antipsychotic medication and did not testify at all concerning potential drug interaction, (2) the State did not prove that the testing requested was essential for the safe and effective administration of the treatment, and (3) the

order did not conform to the evidence with respect to the dosages of medication and the people authorized to administer the medication. We reverse.

¶ 3                                    I. BACKGROUND

¶ 4      On June 11, 2015, H.P. was admitted to Chester Mental Health Center (Chester) after being found unfit to stand trial on multiple criminal charges. On July 22, 2015, the State filed a petition for the involuntary administration of psychotropic medication. The petition was signed by Dr. Muddasani Reddy, a psychiatrist at Chester. Dr. Reddy alleged that H.P. had 11 prior admissions to facilities, beginning in 2010 when he was 18 years old. He further alleged that he had diagnosed H.P. with schizoaffective disorder, depressive type. As a result of this illness, H.P. experienced auditory hallucinations, grandiose delusions, and mood swings between depression and elation. Dr. Reddy alleged that H.P. also exhibited aggressive behavior as a result of his illness.

¶ 5      Dr. Reddy alleged in the petition that H.P. was previously treated with olanzapine, one of the drugs he was asking permission to administer. He alleged that H.P. had signed a consent to take medications but was refusing to do so. Dr. Reddy requested permission to administer olanzapine, lorazepam, benztropine, divalproex, haloperidol, and haloperidol D. He also requested permission to administer six medications, each of which was to be administered as an alternative to one of the six primary medications. He specified a range of dosages for each requested medication. Dr. Reddy asked the court to authorize "testing and other procedures" and alleged that the "testing and procedures are essential for the safe and effective administration of treatment." Finally, he requested that the court authorize him to administer medication to H.P. and to authorize the following individuals, who would serve as alternates: Dr. Tiongson, Dr. Vallabhaneni, Dr. Casey, Dr. Gupta, and Dr. Maitra.

¶ 6    The court held a hearing on the petition on July 29, 2015. Dr. Reddy testified that he had been H.P.'s treating psychiatrist at Chester since June 2015. He testified that he diagnosed H.P. with schizoaffective disorder, depressive type. Dr. Reddy was asked about H.P.'s willingness to take prescribed medications. He replied, "At times, he takes Lorazepam for agitation, but most of the time he refuses two or three times a day [to take] Olanzapine and other needed medications." Dr. Reddy noted that H.P. signed a consent form to take medications. He also noted that H.P. took different medications when he first arrived at Chester. He testified, however, that those medications were not effective.

¶ 7    Dr. Reddy testified that H.P.'s illness caused him to exhibit aggressive behavior. He opined that this behavior was getting worse. He testified that H.P. had to be placed in restraints twice. One time, he struck a staff member. The other time, he attempted to strike a staff member. Dr. Reddy also described two occasions on which H.P. exhibited aggressive behavior but was not placed in restraints. On one occasion, he closed himself in the office of a therapist and refused to leave. On another occasion, he punched another patient in the stomach.

¶ 8    Dr. Reddy testified that olanzapine would benefit H.P. by controlling his psychotic symptoms, alleviating his disorganized thought process, and reducing his hostility and aggression. He explained that possible side effects of olanzapine include shakes, muscle spasms, sedation, metabolic syndrome, neuroleptic malignant syndrome, and tardive dyskinesia. He testified that lorazepam would help H.P. by controlling anxiety, tension, and restlessness but it can cause sedation, incoordination, memory problems, and dependency syndrome. Dr. Reddy testified that benztropine can be taken as needed to alleviate the side effects of olanzapine. Side effects of benztropine include dry mouth, blurred vision, confusion, urinary retention, and constipation. He testified that divalproex is a mood stabilizer. Its possible side effects include sedation, upset stomach, blood cell separation, and kidney and liver dysfunction. He next

testified that haloperidol is an antipsychotic medication that controls hallucinations but it can cause muscle spasms, shaking, tardive dyskinesia, metabolic problems, and neuroleptic malignant syndrome. He explained that haloperidol D is an injectable form of haloperidol.

¶ 9 Dr. Reddy also testified about the expected benefits and the side effects of the alternate medications he was requesting. He noted that Risperdal would be given as an alternative to olanzapine, with benefits that are the same as those of olanzapine and side effects that include extrapyramidal symptoms, shaking, metabolic syndrome, and tardive dyskinesia. He testified that clonazepam would be given as an alternative to lorazepam and that both its benefits and side effects are "like Lorazepam." Dr. Reddy testified that diphenhydramine could be given instead of benztropine to control side effects but it could cause sedation or incoordination. He testified that lithium (the alternate requested for divalproex) is a mood stabilizer with possible side effects of upset stomach, shaking, thyroid dysfunction, and liver dysfunction. He testified that fluphenazine (the alternative for haloperidol) would benefit H.P. by reducing his hallucinations, delusions, disorganized thinking, and aggression. However, it can cause shaking, muscle spasms, tardive dyskinesia, and neuroleptic malignant syndrome. Dr. Reddy was not asked about the benefits or risks of fluphenazine D, the alternate for haloperidol D, but this is presumably an injectable form of fluphenazine. See *In re Suzette D.*, 388 Ill. App. 3d 978, 986 (2009).

¶ 10 Dr. Reddy opined that the benefits of the proposed treatment outweighed the risk of harm. He noted that H.P. had not experienced any adverse side effects from the medications up to that point. Counsel for the State asked Dr. Reddy, "Well, you're asking for the ability to test so that these medications may be safely administered. Has he established a blood level prior to taking these medications?" Dr. Reddy replied, "He did go through a blood test and—well, before we started him on medications." Counsel then asked whether any "metabolic side effects"

experienced by H.P. "would be found in the blood testing." The doctor responded, "Periodically monitored, and the blood test will show any metabolic changes in the parameters."

¶ 11    H.P. also testified at the hearing. He testified that when he first arrived at Chester, his psychiatrist was Dr. Tiongson. He noted, however, that he had talked to Dr. Gupta, Dr. Reddy, Dr. Tiongson, and a female doctor. H.P. testified that Dr. Tiongson initially allowed him to choose his medications. He chose to take Ativan to treat both his anxiety and his depression. In addition, he chose to take Seroquel and Citalopram for depression. He explained that he thought Seroquel was an antidepressant, but he later learned this was not the case. He further testified that Seroquel caused him to suffer painful constipation. H.P. testified that he did not object to taking Ativan. He also testified that he had not requested benztropine because he had not experienced any side effects. H.P. noted that he had been taking his medications during the preceding two weeks. He explained, "I just been taking it because I thought I can get through."

¶ 12    The court entered an order the day of the hearing. It authorized Dr. Reddy to administer the requested medications in the ranges of dosages requested in the petition. It also authorized all of the individuals named in the petition as alternates to administer the medications. In addition, the order authorized "Blood testing, requiring blood draws, to monitor medication, electrolyte and enzyme levels." This appeal followed.

¶ 13                              II. DISCUSSION

¶ 14                              A. Mootness

¶ 15    We begin by observing that the issues raised in this appeal are moot. The order authorizing the involuntary administration of psychotropic medication to H.P. went into effect on July 29, 2015, and expired 90 days later. As such, our decision today cannot grant him effective relief. See *In re Christopher C.*, 2018 IL App (5th) 150301, ¶ 12. Generally, courts do not have jurisdiction to render advisory opinions, address moot questions, or decide appeals in which we

are unable to grant effective relief to any party. *Id.* ¶ 13. However, we have jurisdiction over an appeal that is technically moot if it falls within one of the recognized exceptions to the mootness doctrine. *Id.* Although there is no *per se* exception for mental health cases, most mental health cases fall within one of the recognized exceptions. *In re Alfred H.H.*, 233 Ill. 2d 345, 355 (2009).

¶ 16    One of the recognized exceptions to the mootness doctrine is the public interest exception. Under that exception, we may hear an appeal that is technically moot if (1) the case presents an issue of public concern, (2) there is a need for an authoritative decision to provide guidance to public officials, and (3) the question is likely to recur. *In re Debra B.*, 2016 IL App (5th) 130573, ¶ 20. We find that all three of these requirements are satisfied.

¶ 17    First, as both the Illinois Supreme Court and this court have repeatedly emphasized, the procedural safeguards that must be followed before a mental health patient may be medicated against his will are matters of great public concern. See *In re Mary Ann P.*, 202 Ill. 2d 393, 402 (2002); *Debra B.*, 2016 IL App (5th) 130573, ¶ 21; *In re Evelyn S.*, 337 Ill. App. 3d 1096, 1102 (2003). We acknowledge that when a respondent raises questions concerning the sufficiency of the evidence, as H.P. does in this case, the "inherently case-specific" nature of such questions ordinarily does not "present the kinds of broad public interest issues" involved in most mental health cases. *Alfred H.H.*, 233 Ill. 2d at 356-57. However, H.P.'s claims relate to the type of evidence the State must present to meet its statutory burden, rather than the weight of the evidence presented. This court has recognized that such questions have "broader implications than most sufficiency-of-the-evidence claims." *In re Joseph M.*, 405 Ill. App. 3d 1167, 1173 (2010).

¶ 18    Second, we find that a definitive decision is needed to guide public officials. One of the arguments H.P. raises in this appeal—his claim that the State must provide evidence concerning known drug interactions to meet its burden of proving that the benefits of the proposed treatment

outweigh the risk of harm—appears to be a matter of first impression. See *In re Torry G.*, 2014 IL App (1st) 130709, ¶ 28 (noting the need for an authoritative decision where no prior Illinois cases have resolved the question raised). Guidance on this matter would be particularly helpful to courts and public officials because mentally ill patients are often treated with multiple medications. See *Mary Ann P.*, 202 Ill. 2d at 405. Third, due to the short duration of orders authorizing involuntary treatment, the issues raised in this appeal are likely to recur without the opportunity to be fully litigated before becoming moot. See *id.* at 402-03. We will therefore consider the respondent's arguments under the public interest exception.

¶ 19          B. Principles of Law Applicable to the Respondent's Claims

¶ 20    Our supreme court has held that mentally ill patients have a constitutionally protected right to refuse to be treated with psychotropic medications. *In re C.E.*, 161 Ill. 2d 200, 213-14 (1994). Courts recognize that any involuntary mental health treatment involves "a 'massive curtailment of liberty.' " *In re Barbara H.*, 183 Ill. 2d 482, 496 (1998) (quoting *Vitek v. Jones*, 445 U.S. 480, 491 (1980)). The involuntary administration of psychotropic medications is particularly intrusive. *In re Robert S.*, 213 Ill. 2d 30, 46 (2004). This is so for three reasons. First, involuntary medication constitutes an unwanted "intrusion[ ] into [a patient's] body and mind." *In re Orr*, 176 Ill. App. 3d 498, 512 (1988) (citing *Mills v. Rogers*, 457 U.S. 291, 299 (1982)); see also *C.E.*, 161 Ill. 2d at 214 (recognizing the "substantially invasive nature of psychotropic substances"). Second, psychotropic medications carry a risk of "significant side effects." *C.E.*, 161 Ill. 2d at 214. Third, there is a potential for such medications to be misused—that is, there is a danger that they might be prescribed primarily to manage or control patients rather than to treat their illnesses. *Id.* at 215.

¶ 21    We also recognize, however, "that the state has a legitimate *parens patriae* interest in furthering the treatment" of mentally ill patients who are incapable of making reasoned decisions

- 7 -

regarding their own treatment. *Id.* at 217. The statute authorizing the involuntary administration of psychotropic medication provides important procedural safeguards that protect the rights of patients while balancing these interests. See *id.* at 217-19.

¶ 22    The statute provides that, before a patient may be medicated against his will, the State must prove by clear and convincing evidence that (1) the patient has a serious mental illness; (2) he currently exhibits a deterioration in his ability to function, suffering, or threatening behavior; (3) his illness has been marked by the continuing presence or repeated episodic occurrence of at least one of these three symptoms; (4) the benefits of the proposed treatment outweigh the harm; (5) the patient lacks the capacity to make a reasoned decision about his treatment; and (6) less restrictive alternatives have been considered and found to be inappropriate. 405 ILCS 5/2-107.1(a-5)(4)(A)-(F) (West 2014). If the State requests authorization for testing or other procedures, as it did here, it must also prove by clear and convincing evidence that those tests or procedures are "essential for the safe and effective administration of the treatment." *Id.* § 2-107.1(a-5)(4)(G). The court may only authorize the involuntary administration of psychotropic medication if it finds that the State has met its burden of proving all of these factors. *In re Louis S.*, 361 Ill. App. 3d 774, 779 (2005).

¶ 23    If the court does authorize involuntary medication, it must specify in its order the medications authorized, the ranges of dosages authorized for each medication, and the names of the individuals authorized to administer the treatment. 405 ILCS 5/2-107.1(a-5)(6) (West 2014). The State must provide the court with at least some evidence as to the dosages requested and the individuals who will be authorized to administer the medications. *Christopher C.*, 2018 IL App (5th) 150301, ¶¶ 23-24.

¶ 24    At issue in this appeal is whether the State met its statutory burden of proving that (1) the benefits of the proposed treatment outweighed the harm and (2) the requested testing was

essential to the safe and effective administration of the requested medications. As stated previously, the State was required to prove each of these factors by clear and convincing evidence. *Debra B.*, 2016 IL App (5th) 130573, ¶ 37. This requires the State to present evidence that is "more than a preponderance" but less than "the degree of proof necessary to convict a person of a criminal offense." *In re M.T.*, 371 Ill. App. 3d 318, 323 (2007). Also at issue in this appeal is whether the order conformed to the evidence with respect to the dosages of medication to be administered and the individuals authorized to administer the medications. We review the trial court's factual findings to determine whether they are against the manifest weight of the evidence. *Debra B.*, 2016 IL App (5th) 130573, ¶ 24. However, we review *de novo* questions of statutory compliance. *Christopher C.*, 2018 IL App (5th) 150301, ¶ 18.

¶ 25                         C. Forfeiture and Ineffective Assistance of Counsel

¶ 26    Before turning to the merits of H.P.'s claims, we must address the State's contention that two of these claims have been forfeited. Specifically, the State asserts that (1) H.P. forfeited his claim concerning the sufficiency of the evidence to prove that the benefit of treatment outweighed the harm because he failed to rebut Dr. Reddy's testimony on that question through cross-examination and (2) H.P. forfeited his claim that the order did not conform to the evidence with respect to the dosages and individuals authorized to administer the medications because he did not object to those portions of the order at trial. Although the State does not argue that H.P. has forfeited his claim concerning the evidence that the requested tests were necessary, H.P. acknowledges that his attorney did not raise this issue at trial. He urges this court to address all three issues in spite of his forfeiture, arguing that his attorney's failure to address them constituted ineffective assistance of counsel.

¶ 27    Forfeiture is a limitation on the parties, not the court. *In re Bobby F.*, 2012 IL App (5th) 110214, ¶ 25. Because the involuntary administration of psychotropic medication implicates

fundamental rights, we often review forfeited claims in mental health cases under the plain error doctrine. See *id.*; *Joseph M.*, 405 Ill. App. 3d at 1180; *Suzette D.*, 388 Ill. App. 3d at 984. We therefore choose to overlook H.P.'s forfeiture of these claims and consider the merits of all of his arguments. Because we will resolve his claims on the merits, we need not address H.P.'s claim of ineffective assistance of counsel. See *In re Steven T.*, 2014 IL App (5th) 130328, ¶ 18. We turn to the merits of H.P.'s contentions.

¶ 28          D. Evidence That the Benefits of Treatment Outweigh the Harm

¶ 29    H.P. first argues that the State failed to prove by clear and convincing evidence that the benefits of the proposed treatment outweighed the risk of harm. There are two components to his argument. First, he argues that the State's evidence concerning the benefits of the proposed treatment was insufficient because the State's expert, Dr. Reddy, did not specifically testify to the benefits of polypharmacy, the use of multiple psychotropic medications. Second, H.P. argues that the State's evidence concerning the risk of harm was inadequate because Dr. Reddy did not testify about possible drug interactions. We address these contentions in turn.

¶ 30    We may dispose of the first of these contentions quickly. H.P. emphasizes that two of the primary medications requested in the petition—olanzapine and haloperidol—are both antipsychotic medications. He argues that in order to provide the court with sufficient evidence concerning the benefits of the proposed treatment, Dr. Reddy needed to offer specific testimony about the benefits of using two antipsychotics simultaneously. See *In re Perona*, 294 Ill. App. 3d 755, 767 (1998) (noting that the State met its burden where its expert testified that she requested the use of two neuroleptic medications because administering the two drugs simultaneously increased their efficacy).

¶ 31    Here, Dr. Reddy testified that olanzapine and haloperidol would treat different symptoms—olanzapine was intended to alleviate H.P.'s disorganized thought process and reduce

- 10 -

his hostility and aggression, while haloperidol was intended to reduce his hallucinations. Testimony that proposed medications are expected to treat specific symptoms is sufficient to demonstrate to a court what the benefits of the proposed treatment are. See *In re Dawn H.*, 2012 IL App (2d) 111013, ¶ 17. Obviously, administering only one of the medications would not provide the benefits of treating all of the symptoms treated by both. It is unclear whether similar evidence was presented in *Perona*, the case relied upon by H.P. Absent evidence that multiple medications treat different symptoms, the benefit of prescribing multiple medications might not be clear without further explanation. In this case, however, Dr. Reddy testified that olanzapine and haloperidol each treated symptoms that the other would not treat. We find that the State provided sufficient evidence in this case concerning the benefits of the proposed treatment.

¶ 32    The crux of H.P.'s argument, however, is that the State provided insufficient evidence concerning the risk of harm. This is so, he contends, because Dr. Reddy did not testify about any known interactions between the medications involved. For the reasons that follow, we agree.

¶ 33    The statute governing orders for the involuntary administration of psychotropic medication requires the State to prove by clear and convincing evidence that the benefits of the proposed treatment outweigh the risk of harm from the treatment. 405 ILCS 5/2-107.1(a-5)(4)(D) (West 2014). The statute does not expressly require the State to present any specific type of evidence to satisfy this burden. See *id.* However, Illinois courts—including this court—have consistently construed the statute to require the State to present expert testimony describing both the expected benefits and the possible side effects of each medication requested in the petition. See, *e.g.*, *Dawn H.*, 2012 IL App (2d) 111013, ¶ 17; *In re Larry B.*, 394 Ill. App. 3d 470, 476 (2009); *Suzette D.*, 388 Ill. App. 3d at 985; *In re Alaka W.*, 379 Ill. App. 3d 251, 263 (2008); *In re Gail F.*, 365 Ill. App. 3d 439, 446-47 (2006); *Louis S.*, 361 Ill. App. 3d at 782. The rationale underlying these holdings is that courts are not able to meaningfully assess whether the

- 11 -

benefits of treatment outweigh the risk of harm unless they are presented with evidence of both the benefits and the harms that might occur as a result of the proposed treatment. See, *e.g.*, *Suzette D.*, 388 Ill. App. 3d at 985; *Alaka W.*, 379 Ill. App. 3d at 263-64; *In re Kness*, 277 Ill. App. 3d 711, 720 (1996).

¶ 34    We believe that this rationale applies with equal force to evidence concerning drug interactions. We emphasize that courts are called upon to determine whether the benefits of the proposed treatment outweigh the *harm*. The term "harm" is not limited to adverse side effects from individual medications. Side effects are one type of harm that can result from treatment with psychotropic medications. But they are not the only type of harm that can result. Interactions between prescribed medications can also cause serious harm. As such, expert testimony concerning the risk of this type of harm is necessary to enable the court to make its determination.

¶ 35    We note that, although no prior Illinois cases have addressed the precise question before us, courts *have* recognized the importance of protecting patients from the risk of interactions between involuntarily administered medications. See, *e.g.*, *Robert S.*, 213 Ill. 2d at 52-53 (finding that a psychology intern was not qualified to perform an independent evaluation or give meaningful testimony in proceedings on a petition for the involuntary administration of psychotropic medications because "[o]nly a physician—such as a psychiatrist" has the "level of knowledge *** necessary to safely prescribe medication, to fully recognize its beneficial effects as well as its adverse side effects, [and] *to understand its interaction with other drugs*" (emphasis added)); *In re Dru G.*, 369 Ill. App. 3d 650, 657-58 (2006) (following *Robert S.* and noting that psychologists "cannot give meaningful opinions on the possible harmful effects" of medication because they do not have the requisite knowledge concerning harmful side effects of individual drugs or "*their interactions with other drugs*" (emphasis added)); *In re Williams*, 305 Ill. App. 3d

506, 511 (1999) (finding that the State failed to prove that the benefits of treatment outweighed the harm where the expert's testimony was "general and vague" and the expert was not asked whether three of the medications he wanted to administer had any side effects "*or whether there [were] potential complications posed by the interactions of these medications*" (emphasis added)). Although these cases are not dispositive, they support our decision because they illustrate our concern with the significant harm that can result from drug interactions.

¶ 36    We believe that the possibility of harm resulting from drug interactions is a crucial consideration in determining whether the benefits of a proposed course of treatment outweigh the risk of harm. Without pertinent information on the possibility of such harm, courts do not have adequate information to make a meaningful determination. Thus, we now hold that the State must provide trial courts with expert testimony addressing known drug interactions in order to meet its statutory burden of proving that the benefits of the proposed treatment outweigh the harm. Because the State did not ask Dr. Reddy whether there were any known interactions between the medications he wanted to administer to H.P. simultaneously, the State did not meet its burden, and the order must be reversed.

¶ 37                                 E. Testing and Other Procedures

¶ 38    H.P. next contends that the State failed to provide clear and convincing evidence that the requested testing was essential for the safe and effective administration of the treatment. See 405 ILCS 5/2-107.1(a-5)(4)(G) (West 2014). The State concedes that the evidence presented on this point was not specific enough to meet its statutory obligation. In spite of the State's concession, this court is obliged to independently review the claimed error as part of our duty to protect the public interest. *Larry B.*, 394 Ill. App. 3d at 471 (citing *Young v. United States*, 315 U.S. 257, 258-59 (1942)). We agree with the parties that the State did not meet its burden.

- 13 -

¶ 39    A court may not authorize testing or other procedures unless the State proves by clear and convincing evidence that the tests or procedures are " 'essential for the safe and effective administration of the treatment.' " *Christopher C.*, 2018 IL App (5th) 150301, ¶ 16 (quoting 405 ILCS 5/2-107.1(a-5)(4)(G) (West 2014)). To meet this standard, the State must present expert testimony supported by specific facts. It is not enough for the State's expert to simply opine that the testing is essential. *Id.* ¶ 17; *Steven T.*, 2014 IL App (5th) 130328, ¶ 17; see also *In re David S.*, 386 Ill. App. 3d 878, 883 (2008) (finding an order authorizing tests to be unsupported by the evidence where the State's expert did not testify about "the reasons for the tests" or why they "were deemed 'essential' "). The State must also present at least some evidence specifying what tests and procedures are to be performed and how often they are to be performed. See *Christopher C.*, 2018 IL App (5th) 150301, ¶ 19; *In re Donald L.*, 2014 IL App (2d) 130044, ¶ 27.

¶ 40    In this case, Dr. Reddy testified that H.P. would be "[p]eriodically monitored" and that blood tests would show any "metabolic changes in the parameters." Presumably, this relates to metabolic syndrome, one of the possible side effects of olanzapine and Risperdal. However, Dr. Reddy did not explain why the tests were *essential* for this purpose. In fact, he did not even testify that the tests *were* essential. He also offered no testimony as to the specific tests to be performed or the frequency of those tests. See *Christopher C.*, 2018 IL App (5th) 150301, ¶ 19. As such, we agree with the parties that the State did not provide clear and convincing evidence that the requested tests were essential to the safe and effective administration of the treatment.

¶ 41            F. Dosages and Individuals Authorized to Administer Medications

¶ 42    Finally, H.P. contends that the order did not conform to the evidence at the hearing with respect to the dosages authorized or the individuals authorized to administer medication to him. More specifically, he argues that the portions of the order specifying the dosages of medication

to be administered and designating individuals other than Dr. Reddy as alternates authorized to administer medication do not conform to the evidence because the State presented *no* evidence on either of these matters at trial. The State concedes that it did not present evidence concerning the anticipated dosages or individuals authorized to administer medications. We agree.

¶ 43    The statute governing involuntary administration of psychotropic medication requires courts to "specify the medications and the anticipated range of dosages that have been authorized" and to "designate the persons authorized to administer the treatment." 405 ILCS 5/2-107.1(a-5)(6) (West 2014). The statute does not require the State to provide the court with clear and convincing evidence of either the range of dosages of medication to be administered or the individuals who will be authorized to administer the medications. *Christopher C.*, 2018 IL App (5th) 150301, ¶¶ 23-24. However, the Fourth District has held that the State must present at least some evidence of the range of dosages (*In re A.W.*, 381 Ill. App. 3d 950, 959 (2008)), a holding this court has cited with approval (see *Christopher C.*, 2018 IL App (5th) 150301, ¶ 23), and this court has held that the State must provide at least some evidence regarding the individuals authorized to administer medications (*id.* ¶ 24).

¶ 44    In *A.W.*, the Fourth District explained that, although the State is not required to provide clear and convincing evidence to establish either the specific medications to be administered or the anticipated dosages of these medications, the medication to be administered is a "necessary component" of the evidence required to prove that the benefits of treatment outweigh the harm. (Internal quotation marks omitted.) *A.W.*, 381 Ill. App. 3d at 958-59 (quoting *Louis S.*, 361 Ill. App. 3d at 781, quoting *In re Len P.*, 302 Ill. App. 3d 281, 286 (1999)). The court explained that, for this reason, it had previously held that the State must provide at least some evidence of the types of medication to be administered. *Id.* (citing *Louis S.*, 361 Ill. App. 3d at 781, citing *Len P.*, 302 Ill. App. 3d at 286). The court found that the same rationale required the State to provide

evidence of the anticipated dosages as well. *Id.* at 959. The court went on to hold that, unless the trial court either takes judicial notice of the dosages specified in the petition or admits the petition into evidence for the purposes of establishing the requested dosages, the State must present testimony on this matter. *Id.*

¶ 45 At the hearing in this matter, Dr. Reddy did not testify to the ranges of dosages he intended to administer. Although the petition was "made a part of the record" at the State's request, it was not specifically entered into evidence for purposes of establishing the requested dosages. We therefore agree that the ranges of dosages specified in the petition were not supported by any evidence.

¶ 46 We reach the same conclusion with respect to the individuals authorized to administer medications to H.P. In *Christopher C.*, this court held that the State must present evidence about each individual it asks the court to authorize to administer medication. *Christopher C.*, 2018 IL App (5th) 150301, ¶ 24. We emphasized that the Mental Health and Developmental Disabilities Code requires that patients receive "adequate and humane care" provided by "qualified professional[s]" (Internal quotation marks omitted.) *Id.* (quoting 405 ILCS 5/2-102(a), (a-5) (West 2014)). We explained that at least some evidence about each of the individuals authorized to administer medications is necessary to " 'ensure that only a limited number of designated—and presumably well-trained—individuals will be able to administer these powerful drugs *** to an unwilling recipient.' " *Id.* (quoting *In re Miller*, 301 Ill. App. 3d 1060, 1072 (1998)). Ensuring that a limited number of qualified individuals may involuntarily administer medications is the principal purpose of the requirement that the court designate specific individuals in its order. *In re Cynthia S.*, 326 Ill. App. 3d 65, 69 (2001); *Miller*, 301 Ill. App. 3d at 1072. This requirement also ensures that the medications are administered by "qualified professional[s]

familiar with [the] respondent's individual situation and health status." *Cynthia S.*, 326 Ill. App. 3d at 68-69.

¶ 47    With these principles in mind, we found that the evidence presented in *Christopher C.* supported the order authorizing Christopher's treating psychiatrist, Dr. Vallabhaneni, to administer medications to Christopher. *Christopher C.*, 2018 IL App (5th) 150301, ¶ 25. The relevant evidence consisted of Dr. Vallabhaneni's testimony that he was Christopher's treating physician and his testimony that he wanted to administer the proposed treatment. However, we found that there was no evidence to support authorizing any of the other individuals designated in the order. *Id.*

¶ 48    Similarly, in this case, Dr. Reddy testified that he was H.P.'s treating psychiatrist and that he determined that H.P. would benefit from the proposed treatment. However, he did not provide any testimony related to any of the other individuals authorized to administer the medications. Here, unlike in *Christopher C.*, H.P. provided some relevant testimony about two of those individuals. He testified that he had been seen by many doctors at Chester, including Dr. Gupta and Dr. Tiongson, two of the individuals who were authorized to administer medication to him. He also testified that Dr. Tiongson previously prescribed medications for him. It is not clear how familiar Dr. Gupta was with H.P.'s ongoing care, and there was no evidence at all concerning any of the other individuals authorized to administer medications to H.P. in the court's order. Under *Christopher C.*, the evidence supported an order authorizing Dr. Reddy and Dr. Tiongson to administer medication to H.P. but did not support authorizing any of the other designated individuals. We therefore agree with the parties that authorization of those individuals to administer medications was not supported by the evidence.

- 17 -

¶ 49                           III. CONCLUSION

¶ 50    For the foregoing reasons, we reverse the court's order authorizing the involuntary administration of psychotropic medication and other tests and procedures to H.P.


¶ 51    Reversed.

2019 IL App (5th) 150302

NO. 5-15-0302

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* H.P. | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Randolph County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 15-MH-75 |
| v. | ) | |
| | ) | |
| H.P., | ) | Honorable |
| | ) | Richard A. Brown, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

**Opinion Filed:**       July 1, 2019

_____

**Justices:**       Honorable Melissa A. Chapman, J.

Honorable David K. Overstreet, P.J., and
Honorable Judy L. Cates, J.,
Concur

_____

**Attorneys**
**for**
**Appellant**

Veronique Baker, Director, Barbara A. Goeben, Staff Attorney, Illinois
Guardianship & Advocacy Commission, 4500 College Avenue, Suite 100,
Alton, IL 62002

_____

**Attorneys**
**for**
**Appellees**

Hon. Jeremy R. Walker, State's Attorney, Randolph County Courthouse,
1 Taylor Street, Chester, IL 62233; Patrick Delfino, Director, Patrick D.
Daly, Deputy Director, Kelly M. Stacey, Staff Attorney, Office of the
State's Attorneys Appellate Prosecutor, 730 East Illinois Highway 15,
Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864

_____