2020 IL App (2d) 180018-U
No. 2-18-0018
Order filed February 14, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* TERRI M., Alleged to Be a Person Subject to Involuntary Administration of Psychotropic Medication | ) ) ) ) | Appeal from the Circuit Court of Du Page County. |
| | ) | No. 17-MH-160 |
| | ) | |
| (The People of the State of Illinois, Petitioner-Appellee, v. Terri M., Respondent-Appellant). | ) ) ) | Honorable Robert G. Gibson Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justice McLaren and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court erred in failing to specify the anticipated dosage of one of the drugs in its order for the involuntary administration of psychotropic medication.

¶ 2    Respondent, Terri M., appeals from the order of the circuit court granting the State's petition for the involuntary administration of psychotropic medication under section 2-107.1 of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/2-107.1 (West 2016)). On appeal, respondent challenges the order on numerous grounds. Although many of her arguments have merit, we find one issue is dispositive. Specifically, we find that it was error for the trial court to order the involuntary intramuscular administration of long-acting Risperdal

without specifying the anticipated dose. In addition, as the State's physician failed to testify regarding the appropriate dose, there was no evidence from which the court could determine an appropriate dose. Accordingly, we reverse.

¶ 3    On August 25, 2017, the State petitioned to authorize Dr. Tanmoy Chandra to involuntarily administer oral and intramuscular psychotropic medication to respondent at Linden Oaks Hospital for a period of 30 days. Specifically, the petition sought authorization to administer the antipsychotics Haldol (haloperidol) and Risperdal, a medication to counteract the side effects of those antipsychotics known as Cogentin, and the antianxiety medication Ativan. A hearing on the State's petition was held at Linden Oaks Hospital on August 31, 2017. The State's first witness, Ann Tadeo, a clinical therapist at the hospital, testified that a written description of the risks and benefits of the proposed medications was given to respondent prior to the hearing.

¶ 4    Next, Dr. Chandra testified that he had been respondent's treating psychiatrist at Linden Oaks and had seen her daily since her admission on August 18, 2017. Chandra stated that respondent exhibited "manic features with psychosis." Based on those symptoms, Chandra diagnosed respondent with "either bipolar disorder with psychotic features or schizoaffective disorder *** bipolar type."  Chandra conceded that "a better history is required" for him to make a definitive diagnosis, but stated that in either case, the treatment—the medications for which he sought authorization—would be the same.

¶ 5    Chandra noted that he was able to verify that respondent had two prior psychiatric hospitalizations at McFarland Mental Health Center in Springfield. Respondent was hospitalized for three months beginning in January 2013, and for two weeks in September 2013. Respondent told Chandra that she was arrested for going into someone's apartment. Eventually, she was admitted to Kindred Hospital in Chicago and was then transferred to Linden Oaks. Chandra

explained that respondent's act of trespassing "all kind of ties into her delusion that have to do with gangs [that] were after her, breaking her locks." In reviewing records from respondent's prior hospitalizations, Chandra stated that respondent's paranoid delusions were "consistent":

"[S]he believes that there's been identity theft for years, she believes that someone, that gangs were after her, there's some young girl who supposedly is breaking into her apartment because of some love interest that the patient has with some man, and this girl who is breaking in is envious of her and wants to be her or steal her clothes, or mark her clothes, which the patient adamantly denies is a delusion ***."

During her stay at the Linden Oaks, respondent experienced what Chandra characterized as periods of mania, including a decreased need for sleep, high energy, talkativeness, elevated or irritable moods. Chandra estimated that respondent averaged three to four hours of sleep per night during her stay. Chandra noted that a key feature of respondent's behavior is her "lack of insight." According to Chandra, respondent dismisses her behavior as symptomatic of attention-deficit/hyperactivity disorder (ADHD).

¶ 6    Chandra noted that respondent was highly intelligent and had worked as an accountant until 2003 or 2004. Chandra also stated that respondent was pleasant to speak with and did not appear agitated; she ate well and attended to her personal hygiene and clothing. Nevertheless, Chandra opined that respondent had deteriorated in her ability to function. As Chandra put it, "[O]ne has to remember that she was arrested prior to coming here more than likely because of her mental illness and the behaviors that she was engaging in were because of her mental illness." Chandra also opined that respondent's functioning had declined and that she was suffering. According to Chandra, "[S]he doesn't present like she's suffering, in that she's pleasant and easy

to talk to and does not complain of any suffering, but I do believe she's not living life the way it's intended."

¶ 7    Chandra noted that although respondent had taken part in non-medication therapy at Linden Oaks, such as individual and group counseling, non-medication treatment would be inadequate. According to Chandra, "one has to have some antipsychotics or mood stabilizers to control the symptoms." Chandra then opined that the involuntary administration of antipsychotic medication would be the least restrictive means of treating respondent's mental illness.

¶ 8    When asked about the medications for which he was seeking court authorization, Chandra stated that the primary antipsychotic medication he would prefer to use to treat respondent's symptoms was Haldol—specifically, Haldol decanoate. According to Chandra "decanoate" is a generic term that "just means long[-]acting injectable"—as in a long-acting form of psychotropic medication administered by intramuscular injection. See 405 ILCS 5/1-113.5 (West 2016). Chandra requested authorization to administer five to 15 milligrams of Haldol orally daily and, in the event respondent would not comply with the oral administration of Haldol, Chandra stated that "[t]he dosing for [Haldol decanoate] would be 50 to 100 milligrams" "monthly."

¶ 9    As an alternative to Haldol, Chandra also sought authorization to administer Risperdal. Chandra stated that the daily oral dose of Risperdal would be between three and six milligrams. However, when asked what long-acting dosage he wanted the court to order, Chandra stated, "I would have to double check the dose. I have not used Risperdal long acting in a long time. The frequency of that one would be every two weeks." Chandra then testified that the appropriate dose for both Ativan and Cogentin would be between two and 10 milligrams per day administered orally.

¶ 10    On cross-examination, Chandra testified that during her current hospital stay, respondent

was "well kempt" and maintained her personal hygiene, ate well and did not refuse food, presented herself well, spoke clearly, did not engage in any act of violence, had not threatened any act of suicide, had not threatened any act of homicide, had not threatened any staff member or patient, did not experience any hallucinations, and was "a hundred percent *** pleasant to work with."

¶ 11    The State next called respondent as a witness. Respondent testified that she was 59 years old and had lived in Normal, Illinois. At some point, respondent was admitted to St. Joseph's Hospital in Bloomington. Respondent testified that she was then transported by ambulance from St. Joseph's to Kindred in Chicago, and then again transported by ambulance to Linden Oaks. Respondent testified that she did not live in Naperville but had an uncle who did.

¶ 12    Next, respondent explained that she had worked as an accountant for several companies as well as the Internal Revenue Service (IRS) in Washington, D.C. In 1996, respondent stated that she started to experience "tingling, neurologic symptoms" in her head and her spine, for which she sought treatment. Respondent also began to experience symptoms of chronic fatigue, osteoarthritis, sleep apnea, and hypothyroidism. Respondent stated that she left the IRS in 2004 and began receiving disability payments in 2008.

¶ 13    Respondent testified that an acquaintance had a "financial power of attorney" over her, and that this person had facilitated respondent's living arrangements over the past few years in Bloomington. Respondent stated that her apartment was leased in someone else's name because of "the medical identity fraud" which lead to her having poor credit. Respondent confirmed that she had been arrested in August 2017 before she left the Bloomington area.

¶ 14    On cross-examination, respondent stated that she preferred to take stimulant medication to treat her ADHD. Respondent also stated that after she was arrested in Bloomington, she was released on her own recognizance and then she "found out about the petition to order [her] to be

psychologically evaluated, and that's how [she] got to St. Joe." She stated that she buys her own groceries, cooks her own food, has a valid driver's license, drives a vehicle, and washes her own clothes.

¶ 15    During a brief examination by the court, respondent testified that she had been taking her medication when she was arrested in Bloomington. Respondent also stated that, while she was "guilty of being hyperactive" she "respectfully disagreed" with Chandra's diagnosis.

¶ 16    The State rested without presenting additional evidence on the appropriate dosage for Risperdal decanoate. After closing arguments, the trial court stated that it would grant the State's petition to administer medication to respondent. In addition to the other medications, the court's written order states that Chandra was authorized to administer "Risperdal (PO & Decanoate) 3-6 mg per day." (PO means *per os* or "orally"; as noted above, our concern in this appeal is that the order authorizes the administration of Risperdal Decanoate.) Respondent filed a post-trial motion, which was denied, and a timely notice of appeal.

¶ 17    Before addressing the merits, we note that this appeal is moot because the court-ordered 30-day treatment period has already expired. See *In re Suzette D.*, 388 Ill. App. 3d 978, 983 (2009). We may address moot claims under one of three traditional exceptions, including an exception where the issue involves a harm capable of repetition that evades judicial review. *In re Beverly B.*, 2017 IL App (2d) 160327, ¶ 19. This is such a case, as respondent has been previously (and subsequently) subjected to involuntary-treatment actions.  See *In re Suzette D.*, 388 Ill. App. 3d at 983-84. Accordingly, we apply the capable-of-repetition exception to respondent's argument.

¶ 18    Respondent argues that the trial court's treatment order must be overturned. As respondent notes, the trial court's treatment order authorized the involuntary intramuscular administration of Risperdal decanoate without specifying the proper dose to be administered. In addition, as

respondent notes, the State presented no evidence as to the proper dosage for Risperdal decanoate from which the trial court could take judicial notice. The State concedes these points, but denies that they require reversal. We find that they do.

¶ 19 We will not reverse the trial court's determination unless it was against the manifest weight of the evidence. *In re Laura H.*, 404 Ill. App. 3d 286, 290 (2010). "A judgment will be considered against the manifest weight of the evidence 'only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on evidence.' " *In re Louis S.*, 361 Ill. App. 3d 774, 779 (2005) (quoting *In re John R.*, 339 Ill. App. 3d 778, 781 (2003)). Although respondent failed to raise this issue in the trial court, the involuntary administration of psychotropic medication is invasive by nature and affects a substantial right. Therefore, we review the matter for plain error. *In re Suzette D.*, 388 Ill. App. 3d 978, 984 (2009); see also *In re Cynthia S.*, 326 Ill. App. 3d 65, 68 (2001).

¶ 20 Under the Code, a trial court's involuntary-treatment order must "specify the medications and the anticipated range of dosages that have been authorized." 405 ILCS 5/2-107.1(a–5)(6) (2016). Additionally, the court's order must be supported by clear and convincing evidence as to the anticipated range of dosages of the proposed psychotropic medication. *In re A.W.*, 381 Ill. App. 3d 950, 959 (2008). "Cases concerning involuntary administration of medication require strict compliance with [the Code's] procedural safeguards because of the liberty interests involved." *In re John N.*, 374 Ill. App. 3d 481, 488 (2007) (citing *In re Louis S.*, 361 Ill. App. 3d 774 (2005)). Accordingly, an order that fails to specify the anticipated dose of a medication is defective and must be reversed. See, *e.g.*, *In re Emmett J.*, 333 Ill. App. 3d 69, 73-74 (2002) (reversing order that failed to specify anticipated dosages); see also *In re Len P.*, 302 Ill. App. 3d 281, 286 (1999) (reversing involuntary-treatment order despite waiver because the order failed to specify the type

and dosage of medication).

¶ 21    Here, contrary to the Code's requirements, the treatment order gave Dr. Chandra authorization to administer Risperdal decanoate, but did not specify the proper dosage. Furthermore, the State presented no evidence on the anticipated dose of Risperdal decanoate from which the court could make a reasoned judgment on the matter.

¶ 22    These errors cannot be deemed harmless, as the State suggests. The administration of Risperdal decanoate was a part of the treatment plan the State presented to the trial court. That Risperdal decanoate was an alternative medication in the plan does not matter. In *In re Mary Ann P.*, 202 Ill. 2d 393 (2002), our supreme court held that section 2-107.1 of the Code does not permit the selective authorization of involuntary psychiatric treatment. That is, neither a trial judge nor a jury may " 'pick and choose' among the medicinal components of the treatment." *Id.* at 404. "Accordingly, where, as here, the recommended treatment consists of multiple medications— some to be administered alternatively, some to be administered in combination, and some to be administered only as needed to counter side effects—it is only this treatment, *in its entirety*, that may be authorized." (Emphasis added.) *Id.* at 405-06. Consequently, an error in any aspect of the court-ordered treatment plan compels us to reverse the *entire* order. See, *e.g.*, *In re Gail F.*, 365 Ill. App. 3d 439, 446-47 (2006).

¶ 23    We determine that the trial court's order failed to follow the Code's requirements by failing to specify a dose for the administration of Risperdal decanoate. Furthermore, as the State concedes, there was no evidence as to the proper dose for this medication, which alone would compel reversal. See *In re Suzette D.*, 388 Ill. App. 3d at 985. For these reasons, we reverse the order of the Circuit Court of Du Page County authorizing the involuntary administration of psychotropic medication to respondent.

¶ 24    Reversed.