2025 IL App (1st) 211624-U

No. 1-21-1624

Order filed May 22, 2025

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| *In re* SHEILA R., a Person Found Subject to Involuntary Medication | ) | |
| | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | No. 21-COMH-002658 |
| | ) | |
| v. | ) | Honorable |
| | ) | Nichole Patton, |
| Sheila R., | ) | Judge Presiding. |
| | ) | |
| Respondent-Appellant). | ) | |

_____

JUSTICE LYLE delivered the judgment of the court.
Presiding Justice Rochford and Justice Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the judgment of the circuit court where the court's ruling that the State presented clear and convincing evidence that the benefits of treatment outweighed the harm was not against the manifest weight of the evidence.

¶ 2    Respondent, Sheila R., appeals from an order of the circuit court of Cook County authorizing the involuntary administration of psychotropic medication, entered pursuant to the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/1-100 *et*

*seq.* (West 2022)). Ms. R. raises three issues on appeal. First, she contends that the circuit court failed to comply with the Mental Health Code where it granted the petition for involuntary administration of psychotropic medication despite the lack of clear and convincing evidence that the benefits of the proposed treatment outweighed the harms. Second, Ms. R. asserts that the court failed to adequately assess the risks of combined treatment. Finally, Ms. R. maintains that the court misapplied the burden of proof under the Mental Health Code. For the reasons that follow, we affirm the judgment of the circuit court.

¶ 3                                          I. BACKGROUND

¶ 4      In June 2021, Ms. R. was involuntarily admitted to Hartgrove Behavioral Hospital (Hartgrove) in Chicago, Illinois. On June 24, 2021, Dr. Kruthika Sampathgiri, a psychiatrist at Hartgrove, filed a petition for the administration of authorized involuntary treatment for Ms. R pursuant to section 2-107.1 of the Mental Health Code (405 ILCS 5/2-107.1 (West 2020). Section 2-107.1(a-5)(1) of the Mental Health Code provides that "[a]ny person 18 years of age or older, including any guardian, may petition the circuit court for an order authorizing the administration of psychotropic medication and electroconvulsive therapy to a recipient of services." *Id.* § 2-107.1(a-5)(1). Section 2-107.1(a-5)(4) provides that psychotropic medication "may be administered to the recipient if and only if it has been determined by clear and convincing evidence that all of the following factors are present." The factors listed in that section are:

   "(A) That the recipient has a serious mental illness or developmental disability.

   (B) That because of said mental illness or developmental disability, the recipient currently exhibits any one of the following: (i) deterioration of his or her ability to function, as compared to the recipient's ability to function prior to the current onset of symptoms of the

mental illness or disability for which treatment is presently sought, (ii) suffering, or (iii) threatening behavior.

(C) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in item (B) of this subdivision (4) or the repeated episodic occurrence of these symptoms.

(D) That the benefits of the treatment outweigh the harm.

(E) That the recipient lacks the capacity to make a reasoned decision about the treatment.

(F) That other less restrictive services have been explored and found inappropriate.

(G) If the petition seeks authorization for testing and other procedures, that such testing and procedures are essential for the safe and effective administration of the treatment." *Id.* § 2-107.1(a-5)(4) (West 2020).

¶ 5 In the petition, Dr. Sampathgiri averred that Ms. R. was suffering from a psychotic disorder, but refused to take the recommended medication because she did not believe the diagnosis. Dr. Sampathgiri averred that Ms. R. displayed delusions of paranoid type, disorganization, and perceptual disturbances. Ms. R.'s condition was deteriorating, and Dr. Sampathgiri sought an order from the court authorizing her to administer psychotropic medication for up to 90 days. The petition listed 13 primary medications and their dosages and 3 alternative medications and their dosages.

¶ 6 At the hearing on the petition, Ms. R's brother, Donald R. (Donald), testified that Ms. R. had two adult children and had previously been married. Donald spoke to Ms. R. regularly by text message, but they did not live in the same city. In 2008 or 2009, Ms. R. was admitted to Grady Hospital in Atlanta, Georgia, for about a month. At that time, Donald learned that Ms. R. had been diagnosed with a mental illness, but she had never acknowledged to him that she had been

diagnosed with a mental illness. Donald also recalled a time when Ms. R. was admitted to a psychiatric hospital as a teenager and she was "away for a while." After her hospitalization in 2008 or 2009, Ms. R. obtained a master's degree in social work.

¶ 7    Donald did not know whether Ms. R. took medication for mental illness, but did know that she took medication. When Donald would ask her if she had taken her medication, Ms. R. would respond that she did not want to because the medication made her "feel a certain kind of way" or "didn't make her feel right," but she did not complain of any specific side effects. Donald did not know what kind of medications Ms. R. had taken in the past.

¶ 8    While Ms. R. was living in Atlanta, she lived in a house that her other brother had purchased. Initially, when Donald would visit her in Atlanta, she was doing "fine," but eventually "things got a little out of hand." Ms. R. kept the house clean, but Donald noticed that she was living without utilities. Ms. R. "abruptly" left the home without notice in 2012. Ms. R. bought a bus ticket to Chicago and left all her belongings in the house in Atlanta. In Chicago, Ms. R. was "walking the streets" and had no home address. Eventually, their other brother rented an apartment for her to stay in. Donald visited Ms. R. at the apartment and was concerned about how she was living there. Ms. R. would point out "imperfections" in the apartment, but Donald could not see any of the imperfections. Ms. R. would "always say that she was being raped repeatedly in the apartment" and believed people were looking into the apartment through the blinds despite living on the 11th or 12th floor.

¶ 9    About five months before the hearing, Ms. R. abruptly left the apartment, leaving all her belongings behind. Ms. R. told Donald that she was riding the Greyhound bus to different cities so that she had somewhere to sleep. She would also stay at shelters and police stations. A month before the hearing, Donald visited Ms. R. in Chicago, and they met at a restaurant for lunch. Donald

observed that Ms. R. looked "disheveled," but was wearing clean clothes. Before leaving Chicago, Donald booked Ms. R. a room at a hotel for a few days so that she had somewhere to sleep.

¶ 10    Dr. Sampathgiri testified that she had been practicing as a psychiatrist for one year, and the court found her qualified as an expert in the field of psychiatry. Dr. Sampathgiri cared for Ms. R. when she was admitted to Hartgrove in June 2021. Ms. R. was transferred to Hartgrove on a court-ordered admission. Dr. Sampathgiri learned from Ms. R.'s intake assessment that she was unable to care for herself and left her apartment because she felt that it was being haunted by animals. Ms. R. was homeless, acting "bizarre," and her family was concerned. Ms. R. believed that the Hartgrove staff were members of the Federal Bureau of Investigation, and she had a recording device implanted on her. She also believed that she was a victim of sex trafficking through the internet.

¶ 11    Dr. Sampathgiri conducted an initial evaluation of Ms. R. where Ms. R. mentioned electrical signals in the air and felt she was the victim of sexual abuse through technology. Dr. Sampathgiri evaluated Ms. R. daily. Ms. R. denied any previous medical or psychiatric treatment and refused consent to allow Dr. Sampathgiri to contact her primary care physician. Ms. R. did not allow Dr. Sampathgiri to speak with her family, but Ms. R.'s social worker forwarded her some text messages and emails that the family had received from Ms. R. in the past. Dr. Sampathgiri noted that in the messages, Ms. R. appeared very disorganized and would make "nonsensical statements." Dr. Sampathgiri saw one email, dated January 2018, from Ms. R.'s family that mentioned that she had not been taking her medications for at least the past seven years. Dr. Sampathgiri saw messages from Ms. R.'s brother requesting that she seek medical treatment because she had a mental illness. The messages also referenced Ms. R.'s hospitalization in Atlanta, and suggested that she stopped taking her medication as soon as she was discharged.

¶ 12    Based on this information and discussion with her colleagues, Dr. Sampathgiri determined that Ms. R. has a psychotic disorder, "most likely schizoaffective bipolar type or schizophrenia." This was still a working diagnosis because Dr. Sampathgiri needed to assess her condition for a longer period of time. Dr. Sampathgiri believed that, based on her symptoms, Ms. R.'s condition was deteriorating. Ms. R. was now unable to participate in a safe discharge plan or discuss treatment options. Dr. Sampathgiri believed that Ms. R. was suffering, and Ms. R. told Dr. Sampathgiri that she was suffering. Ms. R. said that the electrical signals in the air caused her pain, and she had not been sleeping well. Ms. R. had been extremely preoccupied and angry because of these paranoid beliefs.

¶ 13    For primary medications to treat Ms. R.'s condition, Dr. Sampathgiri sought to administer Risperdal and Risperdal Consta. She testified that the benefits of these medications are that they treat psychotic symptoms such as hallucinations, responding to internal stimuli, positive disorganization, and paranoia. She testified that the side effects were neuroleptic malignant syndrome, "EPS," hyperplastic anemia, prolonged "QTC," hypertension, and metabolic syndrome.

¶ 14    Dr. Sampathgiri also discussed Olanzapine, which is similar to Risperdal in that it helps treat positive and negative symptoms of schizophrenia as well as positive disorganization, disorganized speech, hallucinations, and paranoia. The side effects of Olanzapine are that it can cause metabolic syndrome, neuroleptic malignant syndrome, "EPS," weight gain, increase cholesterol, and diabetes. The next medications were Invega and Invega Sustenna. These two medications can help positive and negative symptoms of schizophrenia or any psychotic disorder, positive disorganization, and help improve insight. The side effects are hypertension, arrhythmias, prolonged "QTC," and "EPS." Next, Dr. Sampathgiri discussed Haldol and Haldol Decanoate, which also help with the dispositive symptoms of schizophrenia and psychotic disorders. They

also help treat paranoid beliefs and hallucinations. The side effects are "EPS," neuroleptic malignant syndrome, prolonged "QTC," tardive dyskinesia, and dystonic reactions.

¶ 15    To help alleviate some of the side effects of the antipsychotic medication, Dr. Sampathgiri suggested Cogentin. The side effects of Cogentin are constipation, urinary retention, sedation, allergic reactions to Cogentin itself, and dryness of the mouth. Dr. Sampathgiri also discussed Depakote, a mood stabilizer. Its benefits are that it can help with the symptoms of mania, mood lability, mood irritability, and anger. The side effects are that it can cause a drop in platelet count, tremor, weight gain, and hair loss. The final primary medication was Trazodone, which can help with insomnia and depression. The side effects of Trazodone are hypotension, sedation, and allergic reaction to Trazodone.

¶ 16    As for alternative medications, Dr. Sampathgiri discussed Abilify, Abilify Maintena, and Seroquel. Abilify is a mood stabilizer that also treats psychotic symptoms. Abilify had a lower risk for arrythmias and "QCP" prolongation. As for side effects, it can cause weight gain, hyperglycemia, anaphylactic reactions, metabolic syndrome, and neuroleptic malignant syndrome. The benefits of Seroquel are that it can help with psychotic symptoms, sleep issues, anxiety, and stabilization. The side effects are that it can cause sedation, weight gain, worsen hyperglycemia and cholesterol levels, anaphylactic reactions, and prolonged "QTC."

¶ 17    Dr. Sampathgiri had no knowledge of whether Ms. R. had been treated with any of these medications in the past. However, it was her opinion that the anticipated benefits outweighed any possible harm. Dr. Sampathgiri intended to administer a combination of medications, "most likely" an antipsychotic such as Risperdal, Olanzapine, or Invega, combined with a mood stabilizer in case Ms. R. had trouble sleeping. Dr. Sampathgiri would maybe also administer Trazodone and, if there were any side effects or movement issues, combine it with Cogentin. Dr. Sampathgiri

acknowledged that there was a risk of "higher side effects" when administering more than one medication at a time but noted there were no contraindications for the proposed medications.

¶ 18    Dr. Sampathgiri testified that she would begin by administering one antipsychotic medication. If there was a minimal response, she would try an alternative antipsychotic. If there was minimal response to the alternative, she would try using two antipsychotics. She would administer two antipsychotic medications at the same time only if there was very minimal response to one antipsychotic medication. She acknowledged that there would be a higher risk for side effects with that approach, such as a higher risk of prolonged "QTC," a higher chance of neuroleptic malignant syndrome, and a higher chance of other side effects.

¶ 19    Dr. Sampathgiri had previously given Ms. R. written information regarding these medications and Ms. R. became very upset. Ms. R. gave the documents to the social worker and asked her to shred them. Dr. Sampathgiri attempted to speak to Ms. R. about the information, but Ms. R. would not engage with her. Ms. R. denied taking psychotropic medication in the past.

¶ 20    Dr. Sampathgiri did not believe Ms. R. had the capacity at this time to make a reasoned judgment about the proposed treatment. Dr. Sampathgiri had repeatedly attempted to discuss the medication and diagnosis with Ms. R., but she was unable to engage and was preoccupied by her paranoid beliefs. In Dr. Sampathgiri's opinion, Ms. R. lacked the ability to weigh the benefits and risks of the medications.

¶ 21    Dr. Sampathgiri testified that since being admitted at Hartgrove, Ms. R. had been diagnosed with diabetes, high blood pressure, and hyperthyroidism. None of these conditions would prevent her from understanding the risks and benefits of the proposed treatment, but Dr. Sampathgiri acknowledged that these medical problems could be negatively impacted by some of the proposed medications. Antipsychotics can worsen diabetes, blood pressure, and weight gain, but Dr.

Sampathgiri testified that these conditions could be adequately managed through regular follow-up and lab work. The proposed medications would not directly interact with the medications Ms. R. was currently taking to treat her other conditions, but it was important to monitor Ms. R.'s kidney function and lab work, specifically her blood count and metabolic panel.

¶ 22    Dr. Sampathgiri had explored less restrictive treatment alternatives for Ms. R. such as individual and group therapy, but she did not believe those treatment options were sufficient to address Ms. R.'s mental illness at this time. Ms. R. had a negative reaction to group therapy and did not feel comfortable participating.

¶ 23    Ms. R. testified that she grew up in Chicago with her three younger brothers. She graduated high school in 1981 and obtained her bachelor's degree in healthcare management from Southern Illinois University in 2001. In 2010 or 2011 she started receiving Social Security Disability benefits after she was diagnosed with schizophrenia. She obtained her master's degree in social work in 2015 from Clark Atlanta University. In 2018, she moved from Georgia to Chicago. In Chicago, she was homeless until one of her brothers helped her rent an apartment. She lived in that apartment until February 2021 when she became homeless again. While she was homeless, she would sleep at police stations and shelters.

¶ 24    Ms. R. testified that when she was 14 years old, she received an "incorrect medical mental health diagnosis." She testified that she was prescribed medication and had "very serious side effects." Her jaw became "practically paralyzed," and her throat felt like it was closing up. She believed that medication started with the letter "T," but she could not remember what it was called. She also believed she had taken Risperdal after she moved to Atlanta. She took the medication for about a year and started gaining weight very rapidly, going from 180 pounds to 240 or 250 pounds. She testified that this weight gain caused her to develop diabetes. She further testified that she had

taken Seroquel at the same time she was taking Risperdal. The doctor prescribed her Seroquel because she had a sleep disorder, but she did not believe she had a sleep disorder. She testified that she "probably" stopped taking Seroquel because doctors observed that she was not walking correctly. She was "sluggish like and dragging [her] feet."

¶ 25    Ms. R. testified that she did not notice any benefits from Risperdal and the only benefit from Seroquel was that it put her into a deep sleep. She testified that doctors took her off Risperdal because she started to experience side effects such as enlarged breasts. She testified that she took Abilify in 2014 and 2015. She did not experience any benefits or side effects from Abilify.

¶ 26    Ms. R. was currently taking medication for diabetes, hypertension, and a thyroid condition. Ms. R. testified that she was not willing to take any psychotropic medications because she did not need them. She had not taken any psychotropic medications for "many years." She testified that if she were forced to take any of the proposed medications, she would choose Abilify.

¶ 27    On cross-examination, Ms. R. stated that she did not want to cooperate with Dr. Sampathgiri because she was brought to Hartgrove involuntarily. She reiterated that she did not believe she had any mental health issues and was brought to court on a false petition. She again stated that she had not seen any benefits from any of the psychotropic medication she had been prescribed in the past.

¶ 28    Following closing argument by Ms. R.'s counsel, the court granted the petition for the administration of involuntary medication. The court found that Ms. R. had a mental illness. The court credited Dr. Sampathgiri's expert witness testimony regarding her diagnosis and Ms. R.'s symptoms. The court noted that Ms. R. was an educated woman, but she was not able to live a normal life because of her mental illness. The court determined that Ms. R's living situation where she repeatedly would leave the residences her family bought or rented for her and the way she was

living there was indicative of her life spiraling out of control due to mental illness. The court observed that Ms. R. had been receiving Social Security Disability benefits and money from her family but routinely ended up homeless. The court found that this was evidence of Ms. R.'s deterioration and suffering.

¶ 29    The court found that the benefits of treatment outweigh the harm. The court took issue with the fact that Ms. R. did not discuss her history with psychotropic medication with Dr. Sampathgiri, but "conveniently" waited for court.

> "But, however, whichever medication she attributed to the enlargement of the breast, isn't that something you would tell a doctor? And not conveniently wait for court - - why not talk to the doctor and say hey, I've taken these medications before.
>
> If you don't feel like you need to be here, let's have the conversation. I have taken these medications before, these are the symptoms. Instead you say, oh, I don't want to talk to her, I don't want to talk to this lady who's trying to assist me, and conveniently let me just talk about it to the Court so that I can just rattle off all these things."

The court noted that there was testimony that Ms. R. was obese and had other health problems, but the court did not believe those conditions could be attributed to psychotropic medications where Ms. R. testified she had not taken any psychotropic since taking Abilify in 2014 or 2015.

¶ 30    The court found that Ms. R. had been advised in writing of the benefits, side effects, risks, and alternatives. The court determined that Ms. R. lacked the capacity to make a reasoned judgment about the treatment Dr. Sampathgiri sought to administer. The court noted that other, less restrictive services were explored and found inappropriate. The court therefore authorized Dr. Sampathgiri to administer the primary, secondary, and alternative medications identified in her testimony and the petition. The court also ordered that Ms. R. would receive a complete blood

count, complete metabolic panel, EKG, blood glucose testing, Depakote levels, and lipid profile. The court stated that its order was in effect for a period of 90 days and informed Ms. R. of her right to appeal the order.

¶ 31    Ms. R. filed a motion to reconsider and vacate the involuntary treatment order, contending that the State failed to prove by clear and convincing evidence that Ms. R. lacked the capacity to make a reasoned decision about the treatment and that the benefits of the treatment outweigh the harm. Ms. R. asserted that she was able to make a choice about her treatment, as demonstrated by declining psychotropic medication and she was able to list the psychotropic medications she had taken in the past and describe the benefits and side effects of those medications.

¶ 32    Ms. R. also maintained that Dr. Sampathgiri's general testimony about the benefits and side effects of the proposed medication was insufficient to satisfy the State's burden. Ms. R. pointed out that Dr. Sampathgiri acknowledged that she did not know about Ms. R.'s past experiences with psychotropic medication. Meanwhile, Ms. R. did have experience with some of the medication, described the side effects she experienced, and testified she had no benefits from any of the medications.

¶ 33    In ruling on the motion to reconsider and vacate, the court stated it found Ms. R.'s testimony at the hearing to be "incredible." The court did not believe that Ms. R. would not tell the doctors about her side effects from psychotropic medications out of concern that the "doctor would somehow twist it and use it against her." The court noted that Ms. R.'s testimony about when she took the medications and the side effects she experienced was not clear. The court found Dr. Sampathgiri's testimony that the benefits of treatment outweighed the harms "very credible." The court found it notable that when Ms. R. was given written information about the medication, she asked the social worker to shred it. The court repeated its determination that Ms. R. lacked the

capacity to make a reasoned judgment about her treatment. The court therefore denied the motion to reconsider.

¶ 34 Ms. R. filed a timely notice of appeal from the circuit court's order. We find that we have jurisdiction to consider this appeal pursuant to Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303(a) (eff. July 1, 2017).

¶ 35                                                II. ANALYSIS

¶ 36 On appeal, Ms. R. contends that the circuit court erred in granting the petition for the administration of authorized involuntary treatment where the State failed to prove by clear and convincing evidence that the benefits of the proposed treatment outweighed the harm. Ms. R. maintains that the only benefits presented were general descriptions of the medications, which failed to rebut her testimony about the side effects she experienced while taking psychotropic medication. Ms. R. asserts that the court improperly shifted the burden of proof in finding that she should have told Dr. Sampathgiri about her previous experiences with psychotropic medication.

¶ 37                                                A. Mootness

¶ 38 Before we may proceed to the merits, we must first address the State's argument that the instant appeal is moot. As the State points out, the circuit court's order authorizing the administration of involuntary treatment was for a period of 90 days. More than 90 days have elapsed since the entry of that order. The State maintains that this matter is now moot because this court cannot grant Ms. R. any meaningful relief. It is well-settled that "courts in Illinois do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided." *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009).

¶ 39 Ms. R. concedes that the instant appeal is moot but asserts that we should nonetheless decide the merits of this case because it meets one of the exceptions to the mootness doctrine. First,

Ms. R. asserts that public interest exception to mootness applies. She also asserts that mental health cases meet the exception for cases that are "capable of repetition yet avoiding review."

¶ 40     First, we observe that there is no *per se* exception to the mootness doctrine for involuntary treatment orders. *Id.* at 355. Rather, whether an exception applies in a particular case must be evaluated on a case-by-case basis. *Id.* In this case, we find that the exception for matters that are capable of repetition yet evading review applies in this case. That exception has two elements: "(1) the challenged action must be too short in duration to be fully litigated before its end, and (2) there must be a reasonable expectation that the complaining party will be subject to the same action again." *In re Craig H.*, 2022 IL 126256, ¶ 20. Here, the first element has been met because the 90-day duration of the involuntary treatment order was too brief to allow appellate review. *Id.* ¶ 21.

¶ 41     As to the second element, Ms. R's history establishes a reasonable expectation that she will be subject to a petition for involuntary treatment in the future. *Id.* Ms. R. was diagnosed with a mental illness when she was 14 years old and has previously been committed to a mental health facility. Dr. Sampathgiri diagnosed Ms. R. with schizoaffective bipolar type or schizophrenia and determined that Ms. R.'s condition was deteriorating. Despite this, Ms. R. testified that she did not believe she suffered from a mental health disorder and did not believe that she received any benefit from psychotropic medication. Ms. R. has been prescribed these medications in the past and is likely to be prescribed them in the future. Given her refusal to cooperate with Dr. Sampathgiri, she is likely to refuse to take such medications in the future. *In re Jennice L.*, 2021 IL App (1st) 200407, ¶ 14. The record therefore indicates that the legal issue presented in this case can reasonably be expected to recur in a future involuntary treatment proceeding involving Ms. R. See *In re Barbara H.*, 183 Ill. 2d 482, 492 (1998) (finding that the second element of the capable of repetition yet evading review exception had been satisfied where the respondent had a prior history of mental

illness and hospitalization, including involuntary hospitalization, such that it was reasonable to expect that the same action taken against the respondent in that case might confront the respondent again in the future); *In re Robin C.*, 395 Ill. App. 3d 958, 963 (2009) (ruling that the second element of the capable of repetition exception had been satisfied where the respondent had suffered from schizophrenia and had been involuntarily committed on prior occasions such that there was a reasonable expectation that respondent would be subject to the same action again in the future). Accordingly, we find that both elements of the mootness exception for issues capable of repetition yet evading review have been met in this case, and we will therefore address the merits of Ms. R.'s contentions.

¶ 42                                B. Benefits Outweigh Harm

¶ 43    Ms. R. first contends that the circuit court deviated from the Mental Health Code's mandate that clear and convincing evidence must be presented that the benefits of the proposed treatment outweigh the harms. Ms. R. asserts that Dr. Sampathgiri was not aware whether Ms. R. had taken any of the proposed medications in the past, and did not know whether Ms. R. benefited from the medication or suffered side effects. On the other hand, Ms. R. testified about her history with psychotropic medication and the side effects she experienced. Ms. R. maintains that the court should not grant involuntary treatment where there is no testimony of the benefits of a proposed primary medication, but there is evidence of the medication's harm to the patient.

¶ 44    Generally, we will not reverse a trial court's order permitting the involuntary administration of psychotropic medication unless it is against the manifest weight of the evidence. *In re Larry B.*, 394 Ill. App. 3d 470, 473 (2009). A judgment is against the manifest weight of the evidence only where the opposite conclusion is apparent or where the findings appear to be unreasonable, arbitrary, or not based on the evidence. *In re Laura* H., 404 Ill. App. 3d 286, 290

(2010). However, where the question presented is whether the trial court or the State complied with a statutory provision, this presents a question of law, which we review *de novo*. *In re Marcus S.*, 2022 IL App (3d) 170014, ¶ 27; *In re Nicholas L.*, 407 Ill. App. 3d 1061, 1072 (2011).

¶ 45    Ms. R. contends that the circuit court erred in finding that the State satisfied its burden under section 2-107.1(a-5)(4)(D) of the Mental Health Code to prove by clear and convincing evidence that the benefits of the treatment outweighed the harms. She does not challenge the evidence presented on any of the other factors listed in section 2-107.1(a-5)(4). In order to satisfy its burden under section 2-107.1(a-5)(4)(D), the State must present expert testimony describing both the expected benefits and possible side effects of each medication requested in the petition. *In re H.P.*, 2019 IL App (5th) 150302, ¶ 33. "The rationale underlying these holdings is that courts are not able to meaningfully assess whether the benefits of treatment outweigh the risk of harm unless they are presented with evidence of both the benefits and the harms that might occur as a result of the proposed treatment." *Id.* The evidence presented should not be vague but should instead show how the specific medication will benefit the respondent's mental health issues. *In re Leo M.*, 2022 IL App (5th) 190211, ¶ 59. "Clear and convincing evidence is defined as a quantum of proof that leaves no room for reasonable doubt in the fact finder's mind about the truth of the proposition in question." *Id.* ¶ 60.

¶ 46    Here, the petition listed 13 primary medications to be administered either orally or by intramuscular injection. Below that, the petition listed three alternative medications. Dr. Sampathgiri first testified to Ms. R.'s pretreatment condition, describing her symptoms of paranoia and disorganization and diagnosed her with schizophrenia or schizoaffective bipolar type. Dr. Sampathgiri then listed the medications considered to treat Ms. R.'s symptoms, described how they would be administered, and identified the proposed dosages. Dr. Sampathgiri testified at

length regarding the specific benefits and side effects of each medication. She testified that the primary antipsychotic medications she proposed would benefit Ms. R. by treating the symptoms of her schizophrenia, such as hallucinations, disorganization, and paranoia. "Testimony that proposed medications are expected to treat specific symptoms is sufficient to demonstrate to a court what the benefits of the proposed treatment are." *In re H.P.*, 2019 IL App (5th) 150302, ¶ 31 (citing *In re Dawn H.*, 2012 IL App (2d) 111013, ¶ 17). After listing the benefits and side effects of each medication, Dr. Sampathgiri opined that the benefit of the proposed treatment outweighed the harms. Providing testimony regarding the benefits and side effects of the various proposed medications allowed the circuit court to make a determination whether the benefits of the medication outweighed the harms. This was sufficient to meet the State's burden. *In re Dawn H.*, 2012 IL App (2d) 111013, ¶¶ 17-18 (finding that the State satisfied its burden to prove by clear and convincing evidence that the benefit of treatment outweighed the harm where the expert identified and testified to the purpose and side effects of each drug and the respondent's pretreatment condition).

¶ 47    Nonetheless, Ms. R. asserts that the court erred in finding that the State satisfied its burden where Dr. Sampathgiri was unaware of Ms. R.'s previous experiences with the proposed medications, but Ms. R. testified about the side effects she experienced when taking these medications in the past. First, we observe that the circuit court did not find Ms. R.'s testimony credible. Ms. R. contends that the only portion of her testimony that the circuit court did not find credible was her testimony that she was consistent with her blood pressure and diabetes medication while she was homeless, but the court's oral rulings on both the petition and the motion to reconsider belie this contention. In ruling on the petition, the court stated that it did not find

- 17 -

credible Ms. R.'s testimony that her obesity was a side effect of antipsychotic medication where she testified that she had not taken any antipsychotic medication since 2014 or 2015.

¶ 48    In ruling on the motion to reconsider, the court specifically stated that it found Ms. R.'s testimony to be "incredible." The court did not believe that Ms. R. would not talk to the doctors about her side effects from antipsychotic medications out of fear that the information would be used against her. The court also noted that Ms. R.'s testimony was unreliable where she was not even sure when she took different medications and which medications caused the side effects she identified. "I noticed she mentioned the symptoms that she received an enlargement, enlargement of breasts, but we're not sure [] which medication that was from."

¶ 49    Ms. R. points out that the side effects of the antipsychotic medications are likely to worsen her preexisting conditions, such as her diabetes, obesity, and high blood pressure. However, this was a possibility that Dr. Sampathgiri accounted for in her testimony. She noted that Ms. R. had been diagnosed with diabetes, high blood pressure, and hyperthyroidism, and acknowledged that these medical problems could be negatively impacted by some of the proposed medications. Nonetheless, she maintained that the benefit of treatment still outweighed the harms because none of the proposed medications would directly interact with the medications Ms. R. was taking to treat her other conditions, and the other conditions could be adequately managed through regular follow-up and lab work.

¶ 50    We observe that the State can meet its burden to prove that the benefits of the treatment outweigh the harm even where there is evidence of a medication having an adverse effect on the recipient. *In re Brittney F.*, 2024 IL App (4th) 220788, ¶ 55. Contrary to Ms. R.'s contentions, the State is not required to prove that the treatment will cause *no* harm to the respondent, but rather that the benefits of the treatment *outweigh* those harms. Our courts have recognized that

psychotropic medication carries a risk of significant side effects. *In re C.E.*, 161 Ill. 2d 200, 214 (1994). For this reason, the statute requires the State to present evidence of the benefits and side effects of each proposed medication so that the court can adequately weigh the benefits and risks of treatment. *In re Suzette D.,* 388 Ill. App. 3d 978, 985 (2009). Here, the State met this burden through Dr. Sampathgiri's testimony where she identified and testified to the purpose and side effects of each medication and testified to Ms. R.'s pretreatment condition which thereby illuminated the need for proposed treatment. *In re Dawn H.*, 2012 IL App (2d) 111013, ¶ 17.

¶ 51    We find Ms. R.'s reliance on *In re C.S.*, 383 Ill. App. 3d 449 (2008) unpersuasive. In that case, neither of the State's witnesses, which included the respondent's mother and a psychiatrist, testified about the expected benefits of the primary proposed medication. *Id.* at 452. The respondent's mother, however, testified that the respondent experienced severe side effects from the proposed primary medication and a sticker on the respondent's medical chart indicated that she was allergic to that medication. *Id.* at 451, 53. Under these circumstances, the court found that the trial court's decision to allow the involuntary administration of the medication was against the manifest weight of the evidence. *Id.* at 453. Thus, in *C.S.*, there was evidence of prior adverse side effects from the medication, but no evidence of its benefits. In this case, Dr. Sampathgiri testified at length about the benefits of each primary and alternative medication. This was sufficient to allow the circuit court to weigh the benefits and harms of treatment.

¶ 52    Ms. R. contends, however, that reversal is warranted because the circuit court failed to adequately assess the risk of combined treatment where Dr. Sampathgiri proposed using more than one medication to treat Ms. R.'s symptoms. This court has recognized that where it is proposed that a patient be treated with a combination of medications requested in the petition, the State must present the circuit court with evidence of the expected benefits and possible side effects of the

combination of those medications so that the circuit court can determine if the State has met its statutory burden. *In re Jennice L.*, 2021 IL App (1st) 200407, ¶ 31. The State can meet this burden by presenting evidence that multiple medications treat different symptoms or provide "further explanation" about the benefit of prescribing multiple medications. *In re H.P.*, 2019 IL App (5th) 150302, ¶ 31. In addition, the State must present evidence of any known interactions between the proposed medications so that the court can adequately assess the potential harm. *Id.* ¶ 34.

¶ 53 Here, Dr. Sampathgiri first proposed treating Ms. R. with a combination of an antipsychotic medication and a mood stabilizer. She also testified that she would "maybe" administer Trazodone. Dr. Sampathgiri previously explained the benefits and side effects of the antipsychotic medications, namely that they would treat the symptoms of her schizophrenia, such as hallucinations, disorganization, and paranoia. Dr. Sampathgiri further explained that the benefit of adding the mood stabilizer is that it would help Ms. R. sleep. Dr. Sampathgiri identified two mood stabilizers in her testimony. For a primary medication, she discussed Depakote, and for an alternative she discussed Abilify and Abilify Maintena. She testified that the side effects of Depakote were that it can cause a drop in platelet count, tremor, weight gain, and hair loss. The side effects of Abilify and Abilify Maintena are that they can cause weight gain, hyperglycemia, anaphylactic reactions, metabolic syndrome, and neuroleptic malignant syndrome.

¶ 54 Dr. Sampathgiri likewise explained that Trazodone would help with insomnia and depression, and discussed the side effects of Trazodone, which are hypotension, sedation, and allergic reaction to the Trazodone. She acknowledged that there was "always" a risk of "higher side effects" when administering more than one medication at a time but testified that there were no contraindications for the proposed combination of medications. This was sufficient to satisfy the State's burden to provide the trial court with expert testimony addressing known drug

interactions and the benefits and risks of combined treatment. *In re H.P.*, 2019 IL App (5th) 150302, ¶ 36.

¶ 55    Dr. Sampathgiri also proposed potentially treating Ms. R. with more than one antipsychotic medication. She explained that she would begin treating Ms. R. with one antipsychotic. If Ms. R. did not experience benefits from that antipsychotic, she would administer an alternative. If Ms. R. did not experience benefits from the alternative medication, Dr. Sampathgiri would administer two antipsychotics. Dr. Sampathgiri would administer two antipsychotics only if Ms. R. had a "very minimal" response to one antipsychotic medication. Thus, the benefit from the combination of antipsychotic medications is that the two medications combined would have a higher likelihood of treating her symptoms than one medication alone.

¶ 56    Dr. Sampathgiri acknowledged that there was a risk for higher side effects if she administered two antipsychotics. This included a higher risk of prolonged "QTC," a higher chance of neuroleptic malignant syndrome, and a higher risk of the all the side effects she previously identified when describing each medication individually. Again, Dr. Sampathgiri listed the benefits of the proposed combination of medications and the potential harms permitting the court to weigh the benefits and harms of the proposed treatment. Therefore, we find that the State provided sufficient evidence in this case concerning the benefits of the proposed polypharmacy treatment. See *In re H.P.*, 2019 IL App (5th) 150302, ¶¶ 30-31.

¶ 57    For these reasons, we find the circumstances in this case distinguishable from those in *In re Jennice L.*, 2021 IL App (1st) 200407. In *Jennice L.*, the expert witness testified that the respondent could be treated with a combination of psychotropic medications. *Id.* ¶ 7. The expert acknowledged that using these medications in combination could possibly result in "new risks or side effects," but the State never presented evidence regarding those new risks or side effects. *Id.*

¶¶ 7, 31. The *Jennice L.* court determined that without evidence of the new risks or side effects, it was impossible for the circuit court to adequately consider whether the benefits of the proposed treatment outweighed the harm. *Id.* ¶ 31.

¶ 58    In this case, as discussed, Dr. Sampathgiri also acknowledged that treating Ms. R. with two antipsychotic medications would increase the risk of side effects, but she went on to explain that combined treatment would increase that chance that Ms. R. would experience the side effects she previously identified in her testimony when describing each medication individually. She specifically mentioned there was a higher risk of prolonged "QTC" and a higher chance of neuroleptic malignant syndrome. This additional testimony about the possible side effects of the combination of medications was sufficient to allow the circuit court to determine if the State met its statutory burden. Accordingly, we find that the State presented adequate evidence to prove by clear and convincing evidence that the benefit of treatment outweighed the harms and the court's ruling that the State satisfied its burden was not against the manifest weight of the evidence.

¶ 59                                     C. Burden of Proof

¶ 60    Finally, Ms. R. contends that the circuit court misapplied the burden of proof as to the benefits and harms of treatment under the Mental Health Code by blaming Ms. R. for failing to cooperate with Dr. Sampathgiri. Ms. R. points out that the Mental Health Code protects a patient's right to not speak with treating physicians. Ms. R. asserts that the court improperly used Ms. R.'s refusal to cooperate with Dr. Sampathgiri to excuse Dr. Sampathgiri's lack of familiarity with Ms. R.'s previous experiences, and negative side effects, with psychotropic medication.

¶ 61    The premise underlying Ms. R.'s burden of proof contention is that the State failed to satisfy its burden to prove by clear and convincing evidence that the benefits of treatment outweigh the harms, but the court excused the State's insufficient evidence because Ms. R. did not cooperate

with Dr. Sampathgiri and did not allow her access to medical records. As discussed above, however, we find that the State presented sufficient evidence to satisfy its burden.

¶ 62     We also find that Ms. R. mischaracterizes the court's comments about her refusal to cooperate with doctors at Hartgrove. The court did not "excuse" Dr. Sampathgiri's unfamiliarity with Ms. R.'s medical history and thereby shift the burden to Ms. R. to prove that the harms outweighed the benefits. The court simply did not believe that Ms. R. would refuse to tell doctors about her previous side effects with psychotropic medication out of fear that the information would somehow be used against her. The court also found that Ms. R.'s testimony was also unreliable because she did not recall when she received the medications she identified and did not recall which medication caused which side effects.

¶ 63     In short, there is nothing in the court's comments to support Ms. R.'s burden shifting argument. The court's rulings on the petition and the motion to reconsider simply reflect that the State satisfied its burden by presenting the testimony of Dr. Sampathgiri regarding Ms. R's pretreatment condition and the benefits and side effects of each proposed medication, which the court found credible. As discussed, this was sufficient to satisfy the State's burden. The court found Ms. R.'s testimony regarding her previous experiences with psychotropic medication not only incredible, but also unreliable. Under these circumstances, we cannot say that the court failed to comply with the Mental Health Code as Ms. R. contends or that its ruling was against the manifest weight of the evidence.

¶ 64                                III. CONCLUSION

¶ 65     For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 66     Affirmed.